Allen and Hill, Ex'rs, *v.* Shanks.

ALLEN AND HILL, EX'RS, *v.* SHANKS.

(*Jackson.*    June 6, 1891.)

1. ADMINISTRATION. *Jurisdiction of Chancery Court to sell testate decedent's lands to pay debts. Marshaling assets.*

Testator disposed, by will, of his entire estate, real and personal. He authorized his executors to apply the personal assets indifferently to payment of debts, support of his family, and running his farm. He empowered them to lease and sell his lands, and to apply the rents and proceeds to the same purposes. The personal assets and rents of land were entirely exhausted, in part for the purposes aforesaid, and in part by the ravages of war, leaving unpaid debts. The executors filed general creditor's bill against the devisees and legatees, averring exhaustion of personal assets in the manner aforesaid, leaving unpaid debts, and necessity for construction of will, and praying such construction, settlement of their accounts, ascertainment of debts, and sale of land to pay them.

*Held:* This bill was properly filed. Chancery Court has inherent jurisdiction, not conferred nor regulated by statute, to decree sale of a testate decedent's lands to pay his debts, upon the facts stated, although the personalty was not wholly exhausted in payment of debts. It is an exercise of the power to marshal assets. (*Post, pp. 363-371.*)

Case cited and approved: Caruthers *v.* Caruthers, 2 Lea, 268.

2. SAME. *Same. Form of decree.*

And decree authorizing executors to sell lands in such case, is valid and sufficient, even upon direct attack by appeal, when the decree itself, and the Master's report upon which it is based, declare in general terms the exhaustion of personal assets, and in like general terms, the existence of an aggregate unpaid indebtedness, and directs in like general terms the sale of lands to pay debts, without designating parcels or prescribing terms of sale. (*Post, pp. 371, 372.*)

Case cited and approved: Doherty *v.* Choate, 16 Lea, 192.

3. SAME. *Same. Effect of decree.*

But such decree does not authorize sale of lands situate outside this State. (*Post, p. 372.*)

4. SAME.　*Same.　Same.*

And such decree is not an adjudication of their claims in favor of cred-
itors, even when they are specifically set out in bill.　(*Post, p. 373.*)

5. SAME.　*Same.　Suit prevents running of statute of limitations, when.*

As to claims specifically set out in the bill in such case, the commence-
ment of the suit suspends the running of the statute of limitations.
And such claims, not barred at institution of the suit, must be paid,
if filed and proved before final distribution of fund.　(*Post, pp.
390, 391.*)

Cases cited and approved: Caruthers *v.* Caruthers, 2 Lea, 268; Vance
*v.* Sanders, 8 Bax., 294.

Cited and distinguished: Greenlaw *v.* Greenlaw, MS.

6. SAME.　*Same.　Same.*

And it is not essential that debts thus specifically set out in the bill
should be presented by formal pleadings or ascertained by reference
to the Master.　The Court may adjudicate them, if filed and reported
by the Master without a reference.　(*Post, p. 391.*)

Cases cited and approved: Caruthers *v.* Caruthers, 2 Lea, 268; Ewing
*v.* Maury, 3 Lea, 389.

7. SAME.　*Same.　Same.*

As to claims not specifically set out in the bill in such case the running
of the statutes of limitations is not suspended by the institution of
the suit.　Such claims are barred if any statute of limitation has run
against them at the date of their presentation in the cause.　(*Post,
pp. 391, 392.*)

8. SAME.　*Payment of barred claim by personal representative.　Burden of
proof.*

The burden is upon the personal representative who has paid a claim
that was *prima facie* barred, to show such delay at his request as sus-
pended the running of the statute.　The mere fact of payment affords
no presumption in his favor.　(*Post, pp. 392, 393.*)

Case cited and distinguished: Alvis *v.* Oglesby, 87 Tenn., 184.

9. SAME.　*Joint liability of executors.*

Joint executors of will are jointly liable for the entire administration,
although they may, by agreement between themselves, have divided
the work, and each performed his part alone.　(*Post, pp. 393, 394.*)

Allen and Hill, Ex'rs, *v.* Shanks.

10. SAME. *Liability of executors conducting farming operations at a loss.*

Executors are not liable for loss incurred by running a farm as directed by the will, if they acted in good faith, and with due diligence and skill under the circumstances. (*Post, pp. 384–388.*)

11. SAME. *Executor's liability for rents of the trust estate.*

Executors authorized by will to lease and control lands for a specified period, are liable for the reasonable rental value of the lands if they retain possession and control after the termination of the trust estate, although they may have realized nothing from the use of the lands. (*Post, pp. 384–388.*)

12. SAME. *Same.*

Executors are liable for the rents of the trust estate, though they may have actually collected nothing, if the crops, subject to lien for rents, were received and applied, by a firm in which they were interested, to payment of accounts held against the tenants for supplies furnished. (*Post, pp. 384–388.*)

13. SAME. *Same.*

And it is not material that the lands from which the rents were or should have been realized, are situated in another State. The liability is a personal one, and, in this case, the executors have sought the account. (*Post, pp. 384–388.*)

14. SAME. *Executors borrowing money. Interest and usury.*

Executors who have borrowed money for the estate and applied it to that purpose, are entitled to its return with legal interest. But they are not entitled to usury they may have paid upon the loan. (*Post, pp. 388–390.*)

15. SAME. *Executors allowed compensation and attorney's fees, when.*

In this case the executors, though not entirely free from fault and negligence, are allowed compensation for services, and such attorney's fees as were incurred exclusively and necessarily for the benefit of the estate. (*Post, p. 394.*)

16. CHANCERY PRACTICE. *Interlocutory decree not open for revision at subsequent term.*

An interlocutory decree is not open for revision in the same Court at a term subsequent to its rendition, when the decree settles a principle, adjudges a right, or determines an issue. (*Post, pp. 378, 379.*)

Allen and Hill, Ex'rs, *v.* Shanks.

Cases cited and approved: Meek *v.* Mathis, 1 Heis., 537; Johnson *v.* Hanner, 2 Lea, 10; Boyd *v.* Sims, 87 Tenn., 771..

17. SAME. *Decree confirming Master's report without exception, conclusive.*

Decree confirming, without exception, the Master's report upon matters submitted by a valid order of reference is conclusive, after the term is passed, upon all parties, including minors properly represented, not only in the Chancery Court, but upon appeal to this Court, although the report may be erroneous upon the evidence. (*Post, pp. 376–379.*)

Cases cited and approved: Grimstead *v.* Huggins, 13 Lea, 728; Kelly *v.* Kelly, 15 Lea, 194; Vaccaro *v.* Cicalla, 89 Tenn., 63.

18, SAME. *Decree without revivor not reversed, when.*

Decree in administration suit, confirming Master's report and adjudicating debts, as basis for sale of lands, will not be reversed, though rendered after the death of a defendant interested in the lands and without revivor against his heirs, if the latter were already before the Court as original defendants to the cause. Revivor is, however, the proper practice in such case. (*Post, pp. 379, 380.*)

Cases cited and approved: Gilchrist *v.* Cannon, 1 Cold., 582; Whalley *v.* Davis, 1 Swan, 336.

19. SAME. *Decree, without revivor, void.*

But such decree is erroneous, and reversible upon appeal, where, after the death of a defendant interested in the lands, the reference to the Master and his report were made and decree rendered thereon, without revivor against the heir of such defendant—such heir not being an original party to the cause. (*Post, pp. 379–382.*)

20. SAME. *Same.*

It is not sufficient in such case, where the heir is a minor, that *scire facias* had been sued out and returned served upon him at the time the proceedings were had. There must have been actual revivor and representation by guardian *ad litem.* (*Post, pp. 379–382.*)

21. SAME. *Same.*

Revivor of the cause against the minor after the erroneous decree has been rendered does not remedy the error. (*Post, p. 381.*)

Cases cited: Lewis *v.* Outlaw, 1 Tenn., 140; Berrigan *v.* Fleming, 2 Lea, 271.

Allen and Hill, Ex'rs, *v.* Shanks.

22. SAME. *Defense by one party inures to benefit of others, when.*

In administration suit for sale of lands to pay debts, exception to the Master's preliminary report of liabilities by one defendant interested in the lands inures to the benefit of all the defendants. But failure of one defendant to except cannot affect the other defendants. (*Post, pp. 382, 383.*)

23. SUPREME COURT. *Will not remand cause, when.*

Where the correct result has been reached in the final decree of the Chancery Court, this Court will not reverse that decree and remand the cause, although the Chancellor, in order to reach that result, erroneously vacated his own erroneous decrees rendered at former terms. The error is immaterial in such case. (*Post, pp. 383, 384.*)

Case cited and approved: Boyd *v.* Sims, 87 Tenn., 771.

---

FROM SHELBY.

---

Appeal from Chancery Court of Shelby County. B. M. ESTES, Ch.

W. M. RANDOLPH for Allen.

LUKE W. FINLAY for Loudon.

MCDOWELL & MCGOWAN for Frierson.

LURTON, J. Dr. Lewis Shanks, a citizen and resident of Memphis, Tennessee, died October, 1861. He left a will, disposing of his entire estate, and complainants were named as executors, without security. This will was probated in the County

Court of Shelby County, December 2, 1861, and same day complainants qualified as executors.

The estate consisted of a large plantation in the State of Arkansas, upon which were some eighty slaves and a large amount of live stock and other personal property. In Tennessee it consisted of many separate pieces of real estate in the city of Memphis, some of which were improved and under rental.

In April, 1862, the complainants filed an inventory of the Arkansas property, and another of the Tennessee estate, with the Clerk of the Shelby Probate Court. No settlement has ever been made in that Court of the accounts of the executors.

In 1868 this bill was filed in the Chancery Court against the devisees and legatees under the will, for the purpose of construing the will, having a settlement of accounts, and that the executors might have the aid of the Chancery Court in the further administration of the trusts of the estate. This bill alleged the exhaustion of the personal estate in the payment of debts or in supporting the widow and family of testator as directed by the will; it alleged the loss, by emancipation, of all the slaves of the estate, and the loss of all the personal property on the Arkansas plantation, either by pillage and robbery or by being destroyed in maintaining and operating that place as directed by the will; it alleged that debts remained due and unpaid aggregating $40,000 or over, and set out, in an exhibit to the bill, a list

of such creditors and a description of their debts; it alleged that, in carrying out the trusts of the will, the executors had expended large sums in excess of their receipts, and filed a statement of receipts and expenditures as an exhibit to the bill. The necessity that land should be sold to pay debts was urged as a reason for filing the bill; that the executors had endeavored to sell under the powers of the will, but had been unable to complete sales by reason of doubts entertained as to their powers to make such sales. They prayed that the Court construe the will in this regard, and declare their power; and if such power did not exist, that the Court would authorize and empower them to sell lands to pay off the debts due the creditors and the balance due to themselves.

Without now referring to the steps taken in the cause between 1868 and 1891, it is, at present, enough to say that in the latter year a decree was pronounced upon a final hearing of the cause, upon a most voluminous record, by which it was adjudged and determined:

*First.*—That Thos. H. Allen, as executor, upon a final accounting, was indebted to the estate in the sum of $38,678.28.

*Second.*—That the estate was indebted to Executor I. M. Hill, upon a final accounting, in the sum of $1,111.55.

*Third.*—That the estate was indebted to the firm of T. H. & J. M. Allen & Co. in the sum of $40,604.55.

*Fourth.*—That the estate was indebted to Bates, Hyde & Co. in the sum of $904.95.

*Fifth.*—That the executors had been guilty of such mismanagement as to deprive them of all right to compensation, or to counsel fees in this cause.

From this decree both complainants and defendants have appealed, and about sixty errors have been assigned.

It must be obvious that neither the time which may be devoted to this cause without injury to others, nor the limits ordinarily admissible in a legal opinion, will permit the separate discussion and decision of the numerous assignments of error. We can only venture upon the elaboration of a few of the more important questions arising, and announce our ruling upon the rest without discussion, assuring counsel, however, that this transcript has been patiently examined, and every error pointed out fully considered. At the outset it will be noticed that this cause was begun in 1868, and that a final decree was not pronounced until 1891. During this long period of twenty-three years interlocutory decrees were from time to time entered, the effect of which upon the rights of the parties is matter of the most serious controversy.

In 1890 the Chancellor, after a most thorough consideration of the entire pleadings and former decrees, ordered that the Master should take and state an account with complainants from the beginning of their administration, being of opinion

that none of the former decrees had adjudicated any matter of account between complainants and the estate. He also directed a report upon the debts due and unpaid, being of opinion that former decrees had not judicially settled the existence of any unpaid debts. Under a former decree, the executors had made sales of real estate aggregating in all some $100,000. He was of opinion that these sales had been made without authority, and, with the exception of the sales made in 1869 and 1870, he refused to ratify or confirm them. The first decree relied upon by complainants as adjudicating rights and conferring power of sale upon them was entered in December, 1869. In January, 1868, and shortly after the cause was at issue, an order of reference was made, directing the Master to take proof and report as to the personal assets in the hands of the executors, and report whether a sale of lands was necessary to pay the debts of the testator. In February, 1869, the Master reported "that there are no personal assets now in their hands or under their control; that the estate is largely indebted, the debts amounting to forty thousand dollars or over, and that it will be absolutely necessary to sell off real estate to pay this indebtedness." No exceptions were filed to this report, and it was therefore, on December 3, 1869, confirmed. After confirming this report, the decree proceeds to recite "that it appearing to the Court that the personal estate of the decedent, Lewis Shanks, is exhausted, and that debts are

outstanding against and owing by the estate to the amount of forty thousand dollars or more, and that it is necessary to sell the real estate of the said decedent to provide means necessary wherewith to pay the said debts, the Court therefore orders and decrees that the complainants sell of the real estate of the decedent, set forth in the bill of complainant, an amount sufficient to pay the said debts, and that this cause stand over for further decrees and orders and directions as to such matters as remain undisposed of and as may be needful and proper."

The defendants insist that this decree was a nullity, and conferred no authority on the complainants to sell lands of the decedent, and that all sales thereafter made by them were without authority. The complainants insist, on the other hand, that the decree not only operated to confer authority to sell lands to pay debts, but that it had the effect of adjudicating the indebtedness of the estate to the several creditors whose claims were mentioned in the bill, including large balances claimed to be due them on settlement of their accounts as executors, and set out in the schedule of debts annexed to the original bill. The truth lies between these extreme contentions. This decree should be construed in reference to the issues made by the pleadings and prayers for relief, and which these show it was meant to decide. This bill was not an insolvent bill; neither was it a bill under the Act of 1827, carried into the Code of Millikin and Vertrees at §§ 3105, 3106.

The will of Dr. Shanks provided that his personal estate might be used for many purposes other than the payment of debts. It is true that he does direct that his debts should be paid out of debts due him, rents of real estate and proceeds of his plantation; but it is clear that he did not intend that the funds from these sources should be exclusively so applied, for he requires that the executors should, for a number of years, carry on his cotton plantation, and that during all this time they should support and maintain his widow and daughter and two grandchildren in part, and that this daughter and grandchildren should be educated. The scale upon which his widow and daughter were to be supported was to be a liberal one, commensurate with his estate, and such as the widow should desire. The personal estate had therefore been in part used to carry out these objects of the testator. The war had operated to emancipate the slaves, and use added to pillage incident to war had consumed the bulk of the personalty on the Arkansas estate. A case for a sale of realty, under the provisions of §§ 3105, 3106, could not therefore be made out, because it could not be made to appear that the personalty had been exhausted in the payment of debts. The case presented to the Court by the bill was one where the application was to the general jurisdiction of the Chancery Court, rather than to the special or statutory jurisdiction. The personalty is the primary fund for the payment of debts, but when it

24—6 P

has been exhausted under the provisions of a will leaving debts unprovided for, the lands will become assets, and subjected by decree of a Court of Equity under its general jurisdiction. In such case it is a question of marshaling.

Here the executors were charged with the duty of supporting, maintaining, and educating the family of the testator, and also with the hazardous business of running a large cotton plantation for from eight to eleven years. They were also charged with the duty of paying off the testator's debts. They might and did use the personalty for both purposes. The result was, the personalty was insufficient for both purposes, and debts went unpaid. Looking to the whole will, we think the executors had power to sell lands to pay debts at any time before the termination of their trust by the division of the estate at the marriage of the testator's daughter, Virginia. While we think this power is fairly deducible, yet its existence was not so free from doubt as to enable the executors to exercise it. In this situation it was eminently proper to file a bill for a construction of the will in this as well as other particulars, and to obtain a decree for the sale of real estate to enable them to carry out the trusts of the will in regard to the payment of debts.

The jurisdiction of the Chancery Court to entertain a bill for the ascertainment of debts, settlement of accounts, and sale of real estate to pay debts is not dependent on the statute. 1 Story

Eq. Juris., Secs. 532, 544, 549; *Caruthers* v. *Caruthers*, 2 Lea, 265.

Where there is no will permitting use of personalty for purposes or objects other than payment of debts, or where the estate is an insolvent one, then the proceedings in equity are regulated by the statutes, and they must be followed.

The report of the Master established that the personalty had been exhausted. Under this will it was not important whether this exhaustion had been brought about by payment of debts or support of widow and children of testator, or both. The existence of debts aggregating over $40,000 was likewise established. That these debts were aggregated would not affect the validity of a decree of sale, even under the Act of 1827. *Doherty* v. *Choate*, 16 Lea, 192. Under these facts and this will, the Court might well have said the executors have power and authority, under the will, to sell lands of the testator sufficient to pay the debts unsatisfied; or it might, as it did, direct the executors to proceed and sell, thus conferring power if it were lacking. That the bill did not set out and describe the property of the testator, or the decree define the particular property to be sold, was neither fatal to the jurisdiction or the decree directing the executors to sell.

Ordinarily a decree should be more specific; but the testator had vested in these executors the widest discretion as to selling his property, and had shown an unbounded trust in excusing them

from bond. It will not do to say that under such a will, and where the application is by such executors for aid and direction in the administration of their trusts, that a decree directing them to proceed and make sales of enough of the testator's real estate to pay debts is void because it did not give direction as to the parcels to be sold or the terms of sale. The decree clearly authorized the executors to proceed and make such sales of such parts of the testator's estate, within the jurisdiction of the Court, as should be necessary to pay the debts of the estate. We therefore think the sales made thereunder were by authority so far as the property was situated in this State. The sales made of Memphis property in 1888 have been heretofore set aside by the Chancellor, the deeds canceled, and notes and purchase-money returned. The purchasers have submitted to this decree, and no effort is now made to set up said sales; but the sales were made by authority of the decree of 1869. They were good sales so far as prices went, and the expenses incurred by the executors in making them should be allowed as a credit in their account. In 1887 the executors sold and conveyed the Arkansas plantation, and took notes of purchasers. This will was never proven in that State, and complainants have never qualified there. The decree of the Chancery Court did not authorize sales out of the jurisdiction in express terms, and we are unwilling to assume that such power was implied. The purchasers

have not been brought before the Court so that we might affect them by our decree. We think these sales were invalid, and the executors cannot have credit for the notes of the purchasers, and will be chargeable for the rents of the property as if no sale had been made.

For the complainants, as well as for T. H. Allen & Co., creditors, it is urged that the decree of 1869 had another and far more important effect— that is, that the finding that "debts aggregating $40,000 or over" existed unpaid and unsatisfied, operated as an adjudication in favor of the creditors whose debts were mentioned in the bill. In the schedule of debts filed with the bill there was set out a large debt in favor of Thos. H. Allen & Co. In the same schedule a very large balance was set out as due to complainants as executors upon settlement of their accounts. The insistence is that this decree of 1869 was an adjudication of this balance in their favor, and that they can only be required to account for subsequent matters. This contention is unfounded. The complainants' accounts had not been referred to the Master. They had exhibited with their bill a statement of their receipts and disbursements, and prayed for a reference and settlement before the Master. The report of the Master as to indebtedness was in general terms, and was but an estimate. It established the validity of no particular debt, and was only intended as a basis for a decree of sale. Though this bill had been filed for the

purpose of obtaining the aid and direction of the Court in the further administration of their trusts, and to have their accounts passed and the will construed, yet complainants took no further step in this cause for ten long years.

In 1879 the Master was ordered to state an account with the executors from the time they became such, " charging them with proceeds of plantation and rents of other real estate," and with all other assets with which they were chargeable, and also to report on debts unpaid. Proof was taken and a report filed, which, being unexcepted to, was in all things confirmed. By this the accounts of the complainants were passed to date of that account. A balance was reported in favor of complainants on account of excess of disbursements and expenses over receipts of over $35,000. The report and decree also established the existence of debts due and unpaid aggregating about $60,000, more than one-half of which was for money borrowed by the executors for the use of the estate.

From time to time further reports of receipts and disbursements were filed in the cause by complainants, but no other decrees of confirmation were obtained or directions given concerning sales on the execution of the trusts of the will until 1888, when the executors filed a petition in the cause, reciting that they had, at public sale, sold out a large proportion of the unsold Memphis real estate; that some of the purchasers had complied with the terms of sale, and made a cash

payment, and executed notes for deferred payments; that to these they had executed deeds as executors; that others had not complied, but were willing to do so when the Court should ratify and confirm the sale. The Chancellor, upon consideration of the will, pleadings, and former decrees, refused to confirm these sales, holding that they had been made without authority, and ordered deeds and notes canceled and purchase-money returned. By the same decree leave was given complainants to file an amended and supplemental bill. Such a bill was accordingly filed March 27, 1889. This bill set out the original bill and the decrees thereunder, especially that of 1869 adjudicating the exhaustion of personalty and directing the executors to make sales of lands sufficient to pay debts, and the decree of 1880 settling the accounts of the executors and establishing the existence of a large indebtedness to themselves and other creditors. It further set out all sales of real estate made by them under the decree of 1869, including the sales in 1888 of Memphis property, and of the Arkansas plantation, by private sale, in 1887, for $28,000. This bill set out the unpaid debts, including the sums due to themselves as settled by the decree of 1880, and plead these decrees as adjudications, and prayed ratification of the sale of the Arkansas lands, and that the expenses of the Memphis sales, theretofore set aside, be allowed them, and that their accounts subsequent to 1880 be passed, and lands ordered to be sold to pay off the sums

due them and other creditors. The surviving dev-
isees and legatees and the representatives of such
as were dead, were made defendants, and answered
personally or by guardians *ad litem.* To the relief
sought the statutes of two, three, six, and seven
years were plead. Upon the hearing upon original
and supplemental pleadings, former decrees, and
proof, the Chancellor adjudged and decreed:

*First.*—That the decree of 1869 was a valid
decree, and adjudicated that the personalty had
been exhausted, and that a sale of lands for pay-
ment of debts was proper and necessary.

*Second.*—That it did not adjudge the validity of
any particular debt, nor confirm the accounts of
the executors.

*Third.*—That the decree confirming report of
settlement of executors, and of debts, pronounced
in 1880 was interlocutory, and therefore subject to
revision upon final hearing, and being "erroneous
and improvident," was vacated.

*Fourth.*—That an account be taken with the ex-
ecutors from the beginning.

We think the Chancellor was in error in hold-
ing that the decree of 1880 was subject to revision
upon final hearing. It was a decree upon the
report of the Master unexcepted to. By it the
accounts of the executors were passed upon, and
the liability of the estate to them for large sums
of money adjudged; by it unpaid claims of other
creditors whose claims were submitted to the
Master to the amount of $60,000 were adjudicated.

Being unexcepted to, if the proper parties were before the Court and represented, nothing could be done but confirm it. A decree confirming a report of the Master upon matters submitted under a valid decree of reference is not only not subject to be vacated at a subsequent term, but, upon appeal to this Court, is equally beyond our control and revisory power. This is so, though the defendants affected be infants and the report erroneous upon the proof, if they were represented by guardians *ad litem.* A strong illustration of this principle is found in the case of *Grimstead v. Huggins,* 13 Lea, 728. There the administrator, pending the administration of the estate in the Chancery Court as an insolvent estate, rented out the lands of the intestate and applied the rents to the payment of debts. He reported his receipt of rents from time to time, and settlements were made with him from time to time by the Clerk and reported to the Court. The heirs were clearly entitled to these rents. They were infants, but were represented by guardian *ad litem.* The reports, being unexcepted to, were confirmed. Subsequently, and in same cause, the children sought to have these rents paid over to them. This relief was refused, and upon appeal the action of the Chancellor was sustained, Judge Cooper for the Court saying: "It is very clear that the Chancellor, in the year 1883, could not in the same suit go behind these decrees and make a different disposition of the funds. Nor do we see how the children are in any better con-

dition upon an appeal, even if it brings up for revision those decrees; for the reports, being unexcepted to, were properly confirmed. There is no error in them of which the parties, who did not complain then, can now complain. The reports being unexcepted to, we are as much bound to confirm them as was the Chancellor." See also the cases of *Kelley* v. *Kelley*, 15 Lea, 194; and *Vaccaro* v. *Cicalla*, 89 Tenn., 63.

In this latter case, the failure to except to the report of the Master was unimportant, because the Chancellor had, by previous decree, directed that the executor should be allowed, in his settlements, the credit subsequently disallowed by this Court upon appeal. The decree concluded the Master and Chancellor, but, upon appeal, we held the decree erroneous, and thus the basis of the report was destroyed. Every decree which is not final, may, in some sense, be said to be interlocutory. Yet, when an interlocutory decree adjudges rights and settles principles, it is not subject to revision at a subsequent term. If it be a mere order adjudging no issue—as an order concerning the preparation of the cause, or an order granting an injunction, or dissolving or modifying one—such orders are subject to revision and reconsideration; they are in no sense adjudications of rights. The line between interlocutory decrees subject to be revised at a subsequent term, and those not subject to such reconsideration cannot be scientifically defined. But the general rule may be stated to

be, that if it settles a principle or adjudges a right or determines an issue, that, in such case, it is not open for revision at a subsequent term. *Meek* v. *Mathis*, 1 Heis., 537; *Johnson* v. *Hanner*, 2 Lea, 10; *Boyd* v. *Sims*, 87 Tenn., 771.

The Chancellor was, however, of the opinion that the decree of 1880 should be ignored for another reason, to wit: That at the time the reference was made, proof taken thereon, and at the date of the confirmation of the report, certain of the minors interested in the estate were not before the Court. Virginia Lewis Shanks, a daughter of the testator, and a devisee under the will, was a minor at the time the original bill was filed. In 1870, while still a minor, she intermarried with a Mr. London. During the same year the cause was revived against her husband. In 1873—seven years before the decree of 1880—she died intestate, leaving an infant son, the present defendant—Lewis Shanks London.

Mrs. London at time of her death was, under the will and as heir of her mother, entitled to an undivided five-ninths of the real estate of the testator, Lewis Shanks. This interest descended to her son. No steps were taken to bring this son into the cause until June, 1879, when the death of Mrs. London was proven and a writ of *sci. fa.* ordered to issue to Lewis Shanks London, as her heir, commanding him to show cause why the suit should not be revived against him. On the same day that this *sci. fa.* was ordered to issue, the or-

der of reference was entered under which the report of 1880 was made. After this *sci. fa.* had been returned executed, the order of reference was revived, enlarged, and a special commissioner named to take the proof and make the report; but this revivor of the order of reference was made without any revivor of the cause against this heir, or the appointment of any guardian *ad litem* to represent him. In this situation the proof was taken and the report filed and duly confirmed without any notice to any one authorized to appear for or represent this important defendant, and the cause was never revived against him until 1888. The same state of facts existed, in part, as to two minor children of Mrs. Hill, who had small interests under the will, but who had died out of the cause. These children died intestate, leaving both parents and brothers and sisters. These were all before the Court, and were their heirs and distributees. This fact appearing, it was, perhaps, not reversible error that the cause was not revived against them as heirs of these minors. Such revivor is, however, the proper practice. *Gilchrist* v. *Cannon*, 1 Cold., 582; *Whally* v. *Davis*, 1 Swan, 336.

It has been insisted that when this cause was revived against the heir of Mrs. London that its effect was to cure all irregularity growing out of the failure to bring him earlier before the Court. This would be so if nothing had been done in the cause between the death of the ancestor and the revivor affecting the heir. In such case, the

new party takes up the cause in the same plight and condition in which it was at the death of the original party, and is bound by the pleadings and decrees which affected the first party. If the original party has answered, that answer stands as the answer of the new party, and no defense is admissible to a bill of revivor save that the party thus sought to be brought in does not occupy the imputed relation, or that the time has elapsed within which a revivor is permissible. *Lewis* v. *Outlaw*, 1 Tenn., 140; *Berrigan* v. *Fleming*, 2 Lea, 271; Story Eq. Pleadings, Sec. 342.

A revivor by *sci. fa.* is, under the Code, substituted for revivor by bill in equity causes. Code, §§ 5170, 5172. To such *sci. fa.* the defenses are the same as to a bill of revivor. Mere service of the writ requiring this heir to show cause, etc., did not operate to make him a party to the cause, and it was manifest error to proceed with the case until the cause had been revived against and a guardian *ad litem* appointed to defend for him. The decree of 1880 was made before this defendant was made a party or represented, and he is clearly not bound or affected by it. It is not like the case of *Kelley* v. *Kelley*. There the minor was a defendant, but had no guardian *ad litem*. In this situation it was irregular to take any step until one was appointed. But it was held that if no binding decree was taken until after appointment of such guardian, and he had an opportunity to except to a report which had been made, and did

not do so, but acquiesced, that the irregularity in procedure was cured, the presumption being, as stated by the Court in that case, "that the guardian had done his duty, and could find no substantial ground of complaint." 15 Lea, 194.

After this case was revived against this minor, nothing done in the cause in any way waived or cured the error theretofore committed. Other minors interested were parties, and represented by guardians *ad litem* at date of confirmation of the Master's report in 1880. The failure of these guardians *ad litem* to except would have concluded their wards, and if the case had proceeded to a sale of realty to pay debts, the purchasers would have obtained a good title as against the interest of such minors upon a collateral attack. But upon an appeal the unrepresented minor would not be concluded by the failure of others who had been represented to except to such decree. The effect of such an error, when taken advantage of in an appellate proceeding, would be, in a case like this, to reverse the decree as to all the parties.

The decree was one confirming a settlement between the executors and the estate of Lewis Shanks, and confirming a report of the indebtedness of the same estate to other creditors. A defense interposed to such report goes necessarily to the whole decree, and results to the benefit of all, even though the others had failed originally to except, and were therefore in no situation to interpose defenses in an error proceeding. A de-

fense interposed by one heir or devisee in an account such as this was, inures to the benefit of the estate, and its effect cannot be limited to the interest of the one so excepting. The result is that upon an appeal, or other error proceeding, the decree of 1880 would have been reversed because Lewis Shanks London was not a party, and not bound thereby. Not being valid as to Lewis Shanks London, the Chancellor might very well disregard and vacate it as a nullity as to the unrepresented infant. Being so as to that infant, and being vacated on his application, the necessary effect was to open up all the matters settled by that decree, not only as to the unrepresented party, but as to all others whose interests were identical and inseparable from his own. This effect would not perhaps follow if the decree had been a final one, and the lands of the testator had been sold to satisfy the debts thus adjudicated.

Upon a collateral attack upon the title of the purchaser, it is probable that the interest of the minors and others before the Court would be held to have passed to the purchaser. But whether the decree of 1880 was void or only voidable as to Lewis London, the result would now be the same. Upon this appeal, we would be compelled to reverse it, and remand for a new accounting. This new account has been already had, upon full proof, and with all the parties represented, and it would now be folly to remand to have done that which has been already done. So, while the

Chancellor had no power to set aside a decree merely erroneous, yet, where, as in a case like this, the result has been already reached which would be attained by a reversal, we will not hold such a decree, ordering a new account, as reversible error. *Boyd* v. *Sims*, 87 Tenn., 771.

We will, therefore, treat the decree vacating the decree of 1880, and ordering a new report upon the accounts of the executors and upon the debts unpaid, as having been properly made.

The next question to be considered is as to the liability of the executors on account of their management of the Arkansas plantation. The testator, by the third item of his will, directed that this plantation should be carried on, and his other real estate rented out until his daughter, Virginia, should marry and attain the age of eighteen, or until she reached her majority, if unmarried. At the date of this will, this daughter was about ten years of age. Thus, the testator contemplated that for a number of years his estate would be kept together and managed for the benefit of his devisees. Concerning the rents and profits the will directs that: " During this period of eight or eleven years the proceeds are to be applied to the payment of debts, to the ample support of my wife and Virginia Lewis, and the education of Virginia Lewis as my wife may wish and desire."

This daughter married in January, 1870, and was of age in May, 1870. All authority to retain possession of either this plantation or the

Tennessee real estate terminated under this will upon the happening of this marriage, in January, 1870.    At that date it was the duty of complainants to turn over the possession of the realty to the devisees or their representatives.    Their further possession, being unauthorized by the will or decree, was illegal and wrongful, and they were not authorized to involve the estate by a further continuance of the planting operations.    Before this date they were directed to carry on this plantation; and if they did this with good faith, and with that degree of diligence which should characterize a prudent man in the discharge of his own business, they ought not be held liable for results.

In considering the diligence exercised by complainants in the management of this plantation prior to 1871, we cannot and ought not overlook the fact that the wives of these executors were beneficiaries under this will, and that the testator had given them a very wide discretion as to the management of his estate.    They were not expected to personally conduct the plantation.    They were to have it carried on through the agency of others.    This was clearly contemplated.    Neither ought we to overlook the great change which occurred in the whole labor system of the South, as a result of war and emancipation.    Difficulties almost insurmountable confronted complainants in the discharge of this duty.    They tried renting, and they tried running it on account of the estate.

25—6 P

In neither were the results happy. In running it, they did it in the manner others were accustomed to run such properties who had not the capital necesssary to operate upon a cash basis. Supplies were obtained from a commission house on credit, and the cotton consigned to same house to meet the debt created. The usual commissions and interest charges were paid. We see no reason why complainants should not be credited with all expenses incident to the operation of the property, and charged only with the proceeds when the place was run on account of the estate prior to 1871. There is no evidence of bad faith, and no such negligence as makes them chargeable on any other basis.

Prior to 1866 the property seems to have been carried on by the widow. During that year she died. During her life-time no effort is made to impeach the accounts of complainants as to funds which were expended in carrying on the place. For 1866 and 1867 the place was rented out at a rental of $4,000 per year. The executors collected the rent for 1866, and are properly charged. They did not collect the rents for 1867. The crop of 1867, it is shown, was shipped to the commission house of which Complainant Allen was a member, and appropriated by it to the payment of their supply account against the tenants. This crop realized $3,982. The rent was a lien, and it was negligence to suffer this lien to be lost in the way it was, especially in view of the fact that

the crop was appropriated to the payment of a debt due to a firm of which one of complainants was a managing partner. Complainants should be charged with this cotton. During 1868, 1869, and 1870 the place was carried on for the benefit of the estate at a loss. The loss is shown to have been $517 for 1868–69. Complainants are entitled to have the account so recast as to strike out all charge against them for rents of these years, and they will be credited with this sum as of January 1, 1870. We have, with some doubts, concluded that for 1870, although the power to run the place terminated with the marriage of Mrs. London in January, the complainants should not be charged as for an illegal use and retention of the property. The trust did not terminate until after the beginning of the year, and, under the circumstances, we sustain the assignment as to this year's rent. They probably sustained some loss in the operations of that year. The accounts have been so kept, however, that the proceeds of that year are largely carried into the accounts for 1871. No credit will be allowed for such losses.

We think that for all the years subsequent to 1870 complainants should be charged with the reasonable rental value of this place. They retained possession without authority, and cannot cast upon these minors the losses which they may have sustained by an unauthorized retention of dominion and possession. The report and decree as to these rentals will not be disturbed. Complain-

ants did not apply to the Court for a construction of their powers with reference to their possession after the marriage of Mrs. London. They chose to assume the right to retain control, and, however good the motive, they are legally chargeable for rents. It is of no importance that this property was in the State of Arkansas. They had themselves undertaken in this case to account for their management of this property, and, having submitted to an account, they cannot now withdraw when the result seems disastrous. Besides, the liability is a personal one as for rents had and received, or which should have been received, or for their personal wrongful use and possession, and there can be no doubt of the jurisdiction to call them to account.

Although complainants had obtained direction to proceed and sell realty to pay off the debts outstanding as far back as 1869, yet they elected to disobey this order, and made sales of little importance until after a delay of nineteen years. This conduct was based upon an opinion that by delay better sales could be made. In the meantime, however, the debts were pressing for payment. To provide means, they borrowed money at bank rates of interest or discount, on notes made by them as executors. These notes were renewed at short intervals, and when this account was stated, some $20,000 of such notes were outstanding.

The Chancellor properly held that these notes did not bind or charge the estate, and were the

personal obligations of the executors. Inasmuch, however, as the money so borrowed had been used in the payment of debts of the estate, he permitted the executors to be charged with the proceeds of each note discounted on each sum borrowed, and to be credited with the note when paid by renewal or otherwise. He refused to allow them credit for more than legal interest. This borrowing was without authority, and the ruling of the Chancellor in this matter was correct.

Some errors have been assigned upon each side, resulting from the manner in which these transactions have been carried into the accounts. Each note, when made and discounted, has been charged, and, at each renewal, the proceeds have been charged again. So they have been credited with each note when taken up, whether by renewal or payment. Complainants say that in the numerous renewals of such notes, aggregating several hundred thousand dollars, that they have been charged with proceeds of two notes and not credited with payment. The Master reports that it has been a matter of great difficulty to trace each note through frequent renewals. We have also found it impossible, though having the assistance of a remarkably clear report from the Master. This method of stating the account has been the subject of complaint by defendants, who say that each payment of interest on such notes and renewals has been credited as of the day of payment, and then interest allowed upon such interest payments down to the stating of the ac-

count, resulting, as they contend, in compounding interest.

The errors complained of by both sides will be corrected by eliminating from the account these borrowed money transactions altogether. Let the executors be credited with the payments they have made from time to time' for the estate, and allowed interest on such credits from time of such payment to stating of account. If these payments have been made with their own money or borrowed means, they will thus get lawful interest upon such advancements in payment of lawful debts. Interest, on the other hand, will be charged against them on each item of receipt, but no interest will begin until after lapse of two and one-half years from qualification. This will simplify the account, rectify the complaint as to compound interest, and re-imburse complainants with interest for all sums paid in excess of receipts or funds on hand at time of payment.

We come now to the consideration of the decree in favor of T. H. & J. M. Allen & Co. for $40,604.55. This firm were creditors of the testator by notes bearing eight per cent. interest and maturing in 1862. The defendants very earnestly insist upon the several statutes of limitation applicable to estates of decedents. None of them are applicable. This debt was fully mentioned as an outstanding, valid liability of the estate in the schedule of debts filed with original bill. As we have already seen, this bill was a bill seeking a

sale of lands to pay the outstanding debts of this estate, and was filed before the bar of the administrator's statute had operated. It was a bill for the benefit of all creditors whose names and debts were specified, and all such other creditors as should establish their claims within the time allowed by law, whether mentioned or not. Creditors named in the bill as such, became thereby *quasi parties*, and the statute of limitation ceased to run against them, provided they proved their claims in the cause before the fund was distributed. This we think clearly settled in this State. *Vance* v. *Sanders*, 8 Bax., 294; *Caruthers* v. *Caruthers*, 2 Lea, 268.

It is to be remembered that this was not an insolvent bill, and the rules applicable to the filing of claims against insolvent estates in the cause where the estate is being administered do not apply. The ruling in *Greenlaw* v. *Greenlaw*, unreported, is not therefore applicable. No pleading was necessary to set up this debt. If filed with the Master, or reported on by him, it was sufficiently before the Court. Though not submitted to the Master by the Chancellor, he might very well adopt the act of the Master in reporting the debt, as suggested by Judge Cooper in *Caruthers* v. *Caruthers*, *supra; Ewing* v. *Maury*, 3 Lea, 389.

Defendants' tenth and twenty-first assignments must be overruled.

Bates, Hyde & Co. obtained a decree in this cause in 1891 for a debt against the testator.

This debt is not one of those mentioned in the bill, and it was never filed in this cause until 1889. The proof is not satisfactory as to this delay being the result of a definite request for delay made by the executors before the bar of the statute of two and three years. The mere pendency of this proceeding did not operate to suspend the statute as to debts not mentioned in the bill. These creditors should have begun suit before their claim was barred, or made themselves parties to this suit within the time allowed for the assertion of claims against estates. This claim was barred when filed in this cause, and defendants' twenty-second assignment is sustained.

The claims of E. M. Apperson & Co., E. Carver & Co., and J. H. Gray were all paid after the bar of the administrator's statute was complete. It is not shown that suit had been brought within time, or that the delay in suing was at the special request of the executors. Credits for these payments have been improperly allowed complainants. None of these creditors were parties to this suit, and their claims are not mentioned in the bill. The burden of proof is upon a personal representative who pays a debt after the bar of the administrator's statute to show that the delay had been at his request. The fact that he has paid such a debt raises no presumption in his favor when he asks credit for such payment in his settlement. In the case of *Alvis* v. *Oglesby*, we held that where an administrator had been

credited with debts so paid in his settlement in the County Court, that the statutory presumption in favor of such settlement stood until overthrown by proof that such delay was not for a definite time, and at the request of the administrator. 87 Tenn., 184.

No such settlement was ever made by these complainants. The settlement before the Master in 1880 was of no validity, as we have already decided, and no presumption, favorable or unfavorable, can result therefrom. Defendants' twenty-third, twenty-fifth, and twenty-sixth assignments are sustained. The twenty-fourth assignment is overruled. The claim of John Johnson was saved from the bar of the statute by being admitted in the bill. The twenty-seventh assignment is overruled. This debt is sufficiently established under the rule as to concurrence of Master and Chancellor. The eleventh assignment, as to fees paid Halliburton, for the same reason, is overruled. So with the errors complained of by defendants' fifth, sixth, seventh, eighth, ninth, and thirteenth assignments. These matters have been considered, and we are content, under all the circumstances of this case, to sustain the decree in these particulars.

The Chancellor, under the proof, held that Complainant Allen was alone liable for the management of the Arkansas place. There seems to have been some agreement made in 1866, by which Mr. Allen agreed to look after the Arkansas lands while Mr. Hill should look after the Tennessee lands. We

do not think this can affect the joint liability of these complainants. The failure to wind up this estate, and the continuance in possession of the lands in both States, was clearly the result of the concurring opinions of complainants as to the true policy. The division of duty was a matter of personal agreement, and in no way affects the joint liability to defendants. Complainants' twenty-third assignment will be sustained.

No compensation was allowed complainants. A majority of the Court think that for services prior to 1870 they should be allowed a reasonable sum. Upon a consideration of the entire record, they fix this at the sum of five thousand dollars, to be credited without interest as of the date of recasting this account. This they regard as fully covering that portion of counsel fees incurred in filing this bill, and for services up to decree of 1869. After that date the case was practically abandoned until 1888, when it became, and has since been, an adversary proceeding between complainants and the heirs and devisees. Legal services since that date must be borne by complainants personally. All assignments of error not referred to or covered by principles of this opinion will be overruled. The opinion has already reached such length as to make it inexcusable to state our grounds for this ruling. The decree as to costs below will not be disturbed. The costs of this Court will be paid by complainants, but for one-half of same they will be given credit in final account. The

cause will be remanded that the account may be recast, and that a decree, if necessary, may be then made for a sale of lands sufficient to satisfy all debts hereby established.