T.C. Memo. 1996-362

UNITED STATES TAX COURT

O. D. MCKEE AND ESTATE OF ANNA RUTH MCKEE, DECEASED, R. ELLSWORTH
MCKEE AND JACK C. MCKEE, CO-EXECUTORS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18824-93.                    Filed August 7, 1996.

<u>Kirk Snouffer</u>, for petitioners.

<u>Edsel Ford Holman, Jr.</u>, for respondent.

MEMORANDUM OPINION

HAMBLEN, <u>Judge</u>:  Respondent determined deficiencies in O.D.
McKee's gift tax in the amounts of $918,879 and $16,737 for the
periods ending December 31, 1988 and 1990, respectively.
Respondent determined a deficiency in Anna Ruth McKee's
(decedent) gift taxes in the amount of $918,879 for the period

ending December 31, 1988. Respondent further determined a deficiency in decedent's estate's Federal estate taxes in the amount of $1,257,057.

After concessions the sole issue for decision is whether decedent's estate may claim as a deduction from the gross estate certain interest expenses under section 2053(a)(2). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the time of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

This case was submitted fully stipulated pursuant to Rule 122. The stipulation of facts and the attached exhibits are incorporated by this reference, and the facts contained therein are found accordingly. Decedent died on June 25, 1989. Decedent's residence was in Ooltewah, Tennessee in Hamilton County, Tennessee, on the date of her death. Decedent's two sons, R. Ellsworth McKee and Jack C. McKee, are the executors of her estate. Decedent and O.D. McKee (decedent's surviving spouse) were married at all times relevant hereto.

In 1954, decedent and decedent's spouse acquired McKee Foods Corporation (formally known as McKee Baking Co.) (the Company), a closely held corporation that sells snack foods nationally under the "Little Debbie" trade name. The Company holds a significant

percentage of the multipack snack cake market in the United States.

In 1984, the Company amended its charter and divided its 10,000 shares of class A voting stock into the following three classes of voting stock:  2,600 shares of class C voting stock, 2,600 shares of class D voting stock, and 4,800 shares of class E voting stock.  The number of the Company's voting shares remained constant through the date of decedent's death, and no voting shares were ever sold through that date.

On December 26, 1984, the Company and its shareholders executed two stock restriction agreements:  A stock restriction agreement for shareholders who owned class B nonvoting stock (class B buy-sell agreement), and a stock restriction agreement for class C shareholders, class D shareholders, and class E shareholders (voting stock buy-sell agreement).  These stock restriction agreements, as amended, have been used to set the maximum sale price for every sale of Company stock since their execution.

The stock restriction agreements contain various limitations on the transferability of the Company's stock.  Article III of each stock restriction agreement allows a shareholder to transfer stock in the Company to certain "permitted transferees".  Article VII of each agreement contains provisions dealing with the disposition of any of a deceased shareholder's shares not distributed to permitted transferees in accordance with article

III of each agreement. While there are slight differences between article VII of each stock restriction agreement, the timing and the amount of payment for shares purchased by the Company upon the death of a shareholder are substantially the same.

Under the terms of article VII of each stock restriction agreement in effect on decedent's date of death, an executor of the deceased shareholder whose estate qualified to make a section 6166 election, which allows certain estates to pay all or a portion of their Federal estate tax in installments, had two choices with respect to Company stock not transferred in accordance with article III of the agreements. If the executor of the deceased shareholder made a section 6166 election to pay Federal estate tax in installments, the executor could offer the shares to the Company at such times as the executor determined. Under section 7.1(a) of the agreements, an executor who did not make a section 6166 election was required to offer all Company shares, other than shares transferred to "permitted transferees", to the Company within 30 days after the date Federal estate taxes were due to be paid.

Regardless of whether a section 6166 election was made, if an executor offered shares to the Company pursuant to article VII of either agreement, the Company was required to purchase that number of shares which could be redeemed under section 303 (i.e., based on the amount of State and Federal death taxes and

administration expenses). However, upon the closing of the initial offer received from an executor, the Company was required to pay in cash only that portion of the purchase price which did not exceed the sum of: (1) Nondeferable Federal estate tax, (2) one-tenth of the deferred estate tax which could have been paid in installments pursuant to section 6166, (3) State inheritance taxes, and (4) administrative expenses incurred as of the closing date. The balance of the purchase price, if any, was to be paid by delivery of a promissory note payable in nine equal annual installments beginning on the first anniversary of the closing date.

On July 31, 1986, the stock restriction agreements were modified by a document entitled "Amendment to Shareholders' Agreement and Voting Stock Agreement". These amendments did not alter the terms of either the class B buy-sell agreement or the voting stock buy-sell agreement that dealt with the obligations of the Company and the stock transfer procedure triggered by the death of a shareholder.

On August 23, 1988, the Company redeemed 1,960 shares of decedent's class B nonvoting stock for $7,340,200 cash. In August 1988, the Company also declared a 99 for 1 stock dividend on class B nonvoting shares.

On September 27, 1988, decedent executed her last will and testament, which was drafted by her attorney. Article IV of decedent's will set out specific sources of funds for the payment

of debts, expenses, and taxes, and a priority for the use of each source of funds in the payment of decedent's estate obligations. Specifically, article IV of decedent's will provides that decedent's assets should be used in the following priority: (1) Property disclaimed by decedent's spouse, (2) assets that would have passed to decedent's spouse under articles V and IX of decedent's will, (3) decedent's class B nonvoting Company shares (article VIII assets), (4) decedent's limited partnership interests,[1] and (5) decedent's class E voting Company shares (article VII assets). Decedent incorporated into paragraph 3.1 of her will the provision of Tenn. Code Ann. sec. 35-50-110, (repl. vol. 1984), which gave her executors broad powers, including the power to obtain loans. Decedent's will does not mention the stock restriction agreements, nor does it mention section 6166.

On January 15 and September 28, 1988, decedent made gifts of a total of 151,036 shares of class B stock and 1,080 shares of class E Stock, incurring a gift tax for 1988 of $5,212,646.24. Decedent's spouse also made gifts of a total of 151,036 shares of class B stock and 1,080 shares of class E stock on the same dates. Decedent's total gift tax liability was increased by her election to split these gifts with her spouse.

---

[1]Article VI of decedent's will addressed decedent's limited partnership interests, which the parties treated as worthless as of the date of decedent's death.

At her death, on June 25, 1989, decedent owned 109,450 share of class B nonvoting common stock of the Company (class B stock), valued at $4,777,493, and 720 shares of class E voting common stock of the Company (class E stock), valued at $769,680. On the date of decedent's death, the Company had 10,000 outstanding shares of voting common stock, divided as follows: 2,600 shares of class C (all owned by R. Ellsworth McKee), 2,600 shares of class D (all owned by Jack C. McKee), and 4,800 shares of class E stock (720 shares owned by decedent). There were also 8,168,394 shares of class B stock outstanding.

Both of decedent's executors were officers of the Company. R. Ellsworth McKee was the president and chief executive officer of the Company, and Jack C. McKee served as executive vice president of the Company.

Decedent's surviving spouse timely filed a disclaimer of all interest in items totaling $1,955,577 in value that otherwise would have passed to him under decedent's will. Decedent's estate was allowed a marital deduction for the distribution of the nondisclaimed items totaling $440,388 to decedent's surviving spouse. All of the disclaimed assets (except a reversionary interest in a trust reported on Schedule F-1 of the estate's Federal return) were sold and the proceeds were used to help pay decedent's estate's Federal estate tax and State death taxes on March 26, 1990.

Decedent's estate's Federal estate tax return reported a taxable estate of $12,406,660 including $5,515,327 of gift taxes paid on gifts made within 3 years of decedent's date of death. Because decedent's estate's obligations were greater than the amount of property disclaimed by decedent's surviving spouse, the parties agree that, according to article IV of decedent's will, at least a portion of the class B shares would have to be sold to meet decedent's estate's obligations.

Decedent's estate was entitled to make, but did not make, an installment payment election of the Federal estate tax under section 6166, and approximately 40 percent of decedent's estate's Federal estate tax liability could have been deferred. On the due date for payment of decedent's estate's Federal estate tax, the statutory interest rate applicable for section 6166 deferred payments was 11 percent. Because decedent's estate qualified for section 6166, the provisions of article VII of the class B stock buy-sell agreement and the voting stock agreement in effect at decedent's death applied to decedent's estate to the extent that decedent's class B and class E shares did not pass to "permitted transferees" under article III of the respective stock restriction agreements.

Under the terms of each of the two agreements in effect at decedent's death, an executor of a deceased shareholder to which article VII applied had two choices: First, the executor could elect under section 6166 to pay Federal estate tax in

installments and, thus, maintain discretion as to when and how many shares were to be offered to the Company at the price dictated by the agreements at the time of purchase; second, an executor could choose to offer to the company all of the shares not transferred to "permitted transferees", and the Company was obligated to buy the number of the estate's shares necessary to provide funds equal to the amount of State inheritance and Federal estate taxes and administration expenses.

The Company's available cash and loan sources were strained at decedent's death. The Company's total cash outlay for stock redeemed during the fiscal year ending June 30, 1989, was approximately $38 million. The Company also made capital investments of approximately $62 million for expansion of facilities during the same fiscal year. The Company anticipated expenditures of approximately $30 million for the following fiscal year.

On March 26, 1990, the due date for payment of decedent's estate's Federal estate and State death taxes, the executors borrowed $5,522,000 from the Company in exchange for an unsecured demand note bearing interest at 11 percent for a period of 85 days (First Company Loan), which produced an interest expense of $143,418.61. All proceeds for the First Company Loan together with the assets disclaimed by decedent's surviving spouse were applied towards the payment of decedent's estate's Federal estate tax of $5,924,933 and decedent's estate's State death taxes of

$1,519,191, for a total of $7,444,124. The executors did not seek approval from the local probate court with regard to this loan or any other loan they obtained on behalf of decedent's estate.

Prior to obtaining the First Company Loan, the executors determined that the Company's directors and the other class B shareholders agreed with a proposed amendment of the class B buy-sell agreement that would now enable class B shares of a decedent to be pledged to secure a loan to provide funds to pay a decedent's debts, expenses and taxes. The executors intended to repay the First Company Loan as soon as the class B buy-sell agreement could be amended to enable pledging of class B shares in connection with a long-term loan from a source outside the Company. Under the class B buy-sell agreement as it existed at the time of decedent's death, this was not an option available to the executors. The Company's class B and class E shares steadily appreciated in value from 1984.

On April 30, 1990, about 1 month after payment of decedent's estate's Federal estate tax and State death taxes, the executors, other class B shareholders, and the Company's board of directors voted to modify the class B buy-sell agreement to permit a pledge of class B shares to secure a loan to be classified as a "permitted transfer".

On June 20, 1990, the executors repaid the First Company Loan with the proceeds of a loan from Provident National

Assurance Co. in the amount of $5,522,000, with an interest rate of 9.69 percent per annum (Provident Loan).  The executors pledged decedent's class B shares to secure the Provident Loan.

On October 3, 1990, respondent received the estate's timely filed return.  Decedent's estate claimed a deduction of $289,079.77 for interest, accrued or paid though September 26, 1990, on the First Company Loan and the Provident Loan.  On October 3, 1991, respondent also received a Form 843, Claim for Refund and Request for Abatement, in which decedent's estate claimed a refund for overpayment of estate tax resulting from administration expenses of $462,251.22, for interest expenses accrued or paid on the Provident Loan from September 26, 1990, though September 30, 1991.

On January 15, 1991, decedent's estate received, in redemption of 24,100 class B shares, $1,590,600 in cash from the Company, which was used to pay principal and interest due on the Provident Loan on January 15, 1991, and income taxes arising out of the redemption of the class B shares.

On September 16, 1991, decedent's estate borrowed $75,000 from the Company pursuant to a line of credit note (Second Company Loan).  Thereafter, decedent's estate repaid the Second Company Loan together with accrued interest of $1,533.89.

On December 30, 1991, the Company redeemed 69,994 shares of class B stock from decedent's estate, paying approximately $762,000 in cash and delivering a note in the amount of

$4,417,617 (1991 Company Note). The payment schedule and interest terms of the 1991 Company Note were identical to those of the Provident Loan. Accordingly, the interest income received by decedent's estate from the 1991 Company Note exactly offset the interest expense that decedent's estate owed on the Provident Loan.

Decedent's estate reported on Form 1041, U.S. Fiduciary Income Tax Return, a capital gain of $2,124,317.90 from the redemption of the shares of class B stock on December 30, 1991, of which $765,458.18 was recognized in the fiscal year ending May 31, 1992. The balance of this capital gain was recognized in the estate's next fiscal year Form 1041. The total capital gains tax paid was $594,809.

On January 15, 1993, the Company prepaid the 1991 Company Note to decedent's estate, thus enabling decedent's estate to repay the Provident Loan. Decedent's estate paid a total of $1,053,813.96 in interest on the Provident Loan. Decedent's estate was also assessed a prepayment penalty of $22,088 under the terms of the Provident Loan.

On June 15, 1993, decedent's estate borrowed $321,000 from the Company (Third Company Loan). No principal payments have been made on this loan. Interest is payable annually on the Third Company Loan, and the first interest payment of $17,109.30 was made on June 15, 1994.

Decedent's 720 shares of class E voting stock were distributed as follows: 222 shares were transferred to R. Ellsworth McKee, 222 shares were transferred to Jack C. McKee, 78 shares were transferred to an irrevocable trust for the issue of R. Ellsworth McKee, 78 shares were transferred to an irrevocable trust for the issue of Jack C. Mckee, and 30 shares were transferred to each of four individual trusts for the benefit of four of decedent's grandchildren. The only assets remaining in decedent's estate as of January 1, 1995, were 13,506 class B shares and approximately $32,000 in cash.

Decedent's estate has paid and now claims a total deduction for loan interest expense of $1,237,963.60 (including the Provident prepayment penalty of $22,088), plus any additional interest expense incurred on the Third Company Loan.

Discussion

I. Administration Expenses Under Section 2053(a)(2).

Generally, section 2053(a)(2)[2] authorizes an estate to deduct administration expenses that are allowable by the law of the jurisdiction in which the estate is being administered.[3] Section 20.2053-3(a), Estate Tax Regs., provides that expenses actually and necessarily incurred are expenses "in the collection of assets, payments of debts, and distribution of property to the persons entitled to it." As a threshold matter, we will look to Tennessee law, the State where decedent's estate was administered, to determine whether the interest expenses claimed as administration expense deductions are properly deductible.

---

[2]Sec. 2053(a)(2) provides, in relevant part, as follows:

SEC. 2053(a). General Rule.--For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts--

\* \* \* \* \* \* \*

(2) for administration expenses,

\* \* \* \* \* \* \*

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

[3]A deduction is not allowed to the extent the amount of the administration expenses (and other expenses deductible pursuant to sec. 2053(a)) exceeds the value, at the time of decedent's death, of property subject to claims, except to the extent such deduction represents amounts paid before the date prescribed for the filing of the estate tax return. Sec. 2053(c)(2).

See Estate of Todd v. Commissioner, 57 T.C. 288, 294-296 (1971).
Decedent's estate bears the burden of proof on this issue.  Rule
142(a); Welch v. Helvering, 290 U.S. 111 (1933).

Tenn. Code Ann. sec. 35-50-109 (rep. vol. 1984) allows a
testator to incorporate by reference in her will the provision of
Tenn. Code Ann. sec. 35-50-110.  Paragraph 3.1 of decedent's will
incorporated Tenn. Code Ann. sec. 35-50-110, which provides in
part:

> Without diminution or restriction of the powers vested
> in the fiduciary by law, or elsewhere in this
> instrument, and subject to all other provision of this
> instrument, the fiduciary, without the necessity of
> procuring any judicial authorization therefor, or
> approval thereof, shall be vested with, and in the
> application of such fiduciary's best judgment and
> discretion in behalf of the beneficiaries of this
> instrument shall be authorized to exercise, the powers
> hereunder specifically enumerated:
>
> *    *    *    *    *    *    *    *
>
> (8) In behalf of the estate, borrow money;
> evidence such loans by promissory notes or other
> evidence of indebtedness signed by the fiduciary in the
> fiduciary's fiduciary capacity, to be binding upon the
> assets of the estate but not upon the fiduciary in the
> fiduciary's individual capacity; secure such loans by
> assigning or pledging personal property of the estate,
> * * * and repay such loans, including principal and
> interest due thereon.

In Cleveland Bank & Trust Co. v. Olsen, 682 S.W.2d 200 (Tenn.
1984), the Supreme Court of Tennessee faced a situation similar
to the one herein involving the deductibility, for Tennessee
inheritance tax purposes, of interest expenses incurred by an
estate which borrowed funds to pay taxes and other expenses.  The

estate's representative did not seek from a probate or other court prior approval for the loans, relying instead on the decedent's incorporation of Tenn. Code Ann. sec. 35-50-110 into his will. We feel that it is useful to consider in some detail the Tennessee Supreme Court's statements in <u>Cleveland Bank and Trust Co.</u>:

> In order to fund the cash requirements that were necessary to pay the decedent's debts, administration expenses, and death taxes * * *, the executor continued decedent's real estate operations even though this entailed periodic borrowings to pay the interest, debts and taxes. To further alleviate the estate's cash flow problems, the executor paid the death tax in installments plus interest. All of the executor's actions had been expressly authorized by the incorporation of T.C.A. § 35-50-110 * * * into the testator's will. [<u>Id.</u> at 201.]

The court in <u>Cleveland Bank and Trust Co.</u> noted that Tenn. Code Ann. sec. 67-8-315(a) provides that in determining the net estate subject to taxes, expenses of administration are to be taken into account. The court further stated:

> Although T.C.A. § 67-8-315(a) does not define allowable "expense of administration," the general rule is that an executor is entitled to credit his accounts for expenses necessarily and properly incurred in good faith, in transacting with reasonable care and diligence the business of the estate, upon proof of the particular items of expense claimed. * * *
> In accord with the general rule, there is ample Tennessee authority that supports the proposition that a court will credit an executor for interest incurred during administration. <u>T.C.A. § 35-50-110(8) * * *, for example, specifically authorizes an executor to borrow money and pay interest when the decedent incorporates this provision into his will, as the testator did in this case</u>.

In <u>Coffee v. Ruffin</u>, 44 Tenn. 487 (1867), the executor was granted broad powers under the will. During the administration of the will, the executor borrowed money at usurious rates of interest to prevent a sacrificial sale of the real estate. The court credited the executor for the usurious interest paid, noting the broad discretion conferred upon the executor by the will to borrow money, even at usurious rates, and to charge the estate with that interest. In <u>Allen v. Shanks</u>, 90 Tenn. 359, 16 S.W. 715 (1891), the executor borrowed money without express authorization. Because the money was used to benefit the estate, however, the court credited the executor for legal interest paid on the loan, but it refused to credit the usurious percentage of the interest.

As the <u>Coffee</u> and <u>Ruffin</u> [sic <u>Allen</u>] courts credited interest as a cost of administration under those circumstances, likewise, interest should be a proper expense of administration when specifically authorized by the terms of the will, as in the present case. <u>Interest is simply the cost of using money, and there should be no differentiation for purposes of deductibility whether the interest is paid on taxes or on money borrowed to pay the taxes</u>. <u>Estate of Bahr v. Commissioner</u>, 68 T.C. 74 (1974); * * * [<u>Id.</u> at 202; emphasis added.]

Under Tennessee law, the incorporation in a will of the statutory power set forth in Tenn. Code Ann. sec. 35-50-110(8) authorizes an executor to borrow funds and provides that a Tennessee court will credit an executor for interest necessarily and properly incurred on loans. Decedent incorporated by reference the provisions contained in Tenn. Code Ann. sec. 35-50-110 into her will.

Respondent would distinguish <u>Cleveland Bank and Trust Co. v. Olsen</u>, <u>supra</u>, on the grounds that in that case the incorporation of the statutory power to borrow was not restricted by limiting language in the will. In the instant case, the incorporation of

Tenn. Code Ann. sec. 35-50-110 in decedent's will was qualified by the phrase "to the extent applicable, and except as otherwise amended or modified herein".  Respondent asserts that decedent's will provided a clear statement of how the estate's debts, taxes, and expenses were to be paid.  Respondent maintains that decedent's detailed payment provisions coupled with the buy-sell agreement in effect on decedent's date of death specifically prohibited her executors from obtaining loans and that their action in doing so was unauthorized and should not be charged to decedent's estate.

The crux of respondent's argument is that decedent must have known that her estate could face large potential obligations for taxes and other liabilities.  Decedent knew that taxes might arise from the inclusion in her taxable estate of gift taxes on gifts she made in January and September 1988, if she died within 3 years of the gifts.  Decedent was aware that the buy-sell agreements provided a means for the sale of her Company stock to obtain funds to pay the liabilities of her estate.  Respondent contends that decedent consequently gave her executors an "indirect instruction" to elect section 6166 installment payment of the taxes because such an election was necessary to conform the terms of the buy-sell agreements with the terms of the will as those terms were understood by decedent.  We disagree.

Under Tennessee law, the basic rule in construing a will is that the court shall seek to discover the intention of the testator and will give effect to it unless it contravenes some rule of law or public policy. In re Walker, 849 S.W.2d 766 (Tenn. 1993); Daugherty v. Daugherty, 784 S.W.2d 650, 653 (Tenn. 1990); Harris v. Bittikofer, 541 S.W.2d 372, 384 (Tenn. 1976). The testator's intention is to be ascertained from the particular words used in the will itself, from the context in which those words are used, and from the general scope and purposes of the will, read in the light of the surrounding and attending circumstances. Third Natl. Bank v. First American Natl. Bank, 596 S.W.2d 824, 828 (Tenn. 1980); Moore v. Neely, 370 S.W.2d 537, 540 (Tenn. 1963). In applying this cardinal rule, it is necessary to look to the entire will, and the testator's intent must be ascertained from what the testator has written into the will and not from what some interested party supposes that the testator intended to do. Burdick v. Gilpin, 325 S.W.2d 547, 551 (Tenn. 1959); Davis v. Price, 226 S.W.2d 290, 292 (Tenn. 1949). Where a testator expresses a controlling or predominant purpose, it is the duty of the court to effectuate that purpose and construe all subsidiary clauses to bring them into alignment with that purpose. Moore v. Neely, supra at 540. Moreover, a general intent will prevail over a secondary intent. Jones v. Jones, 462 S.W.2d 872 (Tenn. 1971). A will should be so construed to speak

as of the date of the testator's death.  Presley v. Hanks, 782

S.W.2d 482, 488 (Tenn. Ct. App. 1989) (citing Tenn. Code Ann.

sec. 32-3-101 (1984)).

In Tennessee, technical words used in a will drafted by an

attorney are to be given their technical meaning, in the absence

of a finding of a contrary intent on the part of the testator.

Fariss v. Bry-Block Co., 346 S.W.2d 705, 707 (Tenn. 1961).  In

Daugherty v. Daugherty, supra at 653, the Supreme Court of

Tennessee explained the role of a court in examining the language

of a will by stating:

> The basic rule in construing a will is that the court
> shall seek to discover the intention of the testator,
> and will give effect to it unless it contravenes some
> rule of law or public policy.  That intention is to be
> ascertained from the particular words used, from the
> context and from the general scope and purpose of the
> instrument.  [Citations omitted.]

The duty of the court is to expound, not create.  Id.  "This

Court cannot make a different will for her under the guise of

construing it."  Sands v. Fly, 292 S.W.2d 706, 713 (Tenn. 1956).

Where a testator's intention cannot be given effect because of

public policy or certain rules of law, it must be given effect as

far as possible.  White v. Brown, 559 S.W.2d 938, 939-940 (Tenn.

1977); Bell v. Shannon, 367 S.W.2d 761, 766 (Tenn. 1963);

Hamilton Bank v. Milligan College, 821 S.W.2d 591, 592 (Tenn. Ct.

App. 1991); Merchants & Planters Bank v. Myers, 644 S.W.2d 683,

688 (Tenn. Ct. App. 1982).

Decedent's will was drafted by an attorney and contains many terms of art. There is nothing in the wording of decedent's will, in the context in which it was written, or "in the surrounding and attending circumstances" that indicates that the testator intended to limit the power of the executors to borrow funds without a probate court's approval. By incorporating the provisions of Tenn. Code Ann. sec. 35-50-110 into her will, decedent granted the executors of her estate broad powers including the power to borrow without the necessity of procuring judicial authorization therefor, or approval thereof. Cleveland Bank and Trust Co. v. Olsen, 682 S.W.2d 200 (Tenn. 1984). Decedent's will did not require her executors to make a section 6166 election. Decedent's will does not even mention section 6166. The only mention of section 6166 is in the buy-sell agreements. The buy-sell agreements are not mentioned in decedent's will, are not incorporated by reference into decedent's will, and have little or no bearing on the testamentary intent expressed in the will. Decedent did not dictate the manner in which the obligations of her estate were to be satisfied, apart from giving instructions on the order in which her assets were to be employed for that purpose. The amendment to the class B buy-sell agreement modified the Company's obligation to purchase stock from a deceased shareholder's estate. The Company's obligation was not

eliminated. If shares of class B stock were pledged to secure a loan that was obtained to pay taxes, the Company was obligated to purchase sufficient shares of class B stock to permit timely repayment of the loan.

We find that the executors have used decedent's assets in the order she mandated. Property disclaimed by her surviving spouse was sold and the proceeds applied within 9 months of the date of her death to pay taxes and other obligations of decedent's estate. Decedent's only other available assets were the class B stock and the class E stock. Decedent directed that class B stock be used first. Class B stock has been utilized to satisfy the estate's remaining obligations, first by the pledging of this stock to obtain loans to provide funds for the payment of taxes, and then by sale of the stock to the Company in order to provide funds for the repayment of the loans.

If a section 6166 election had been made in this case, the executors would have needed to immediately raise $5,334,320 for the nondeferable taxes and other debts and expenses. After utilizing all available cash and disclaimed assets, the executors would still have needed $3,445,737 to pay these obligations, and the only way to obtain funds would have been the immediate sale of class B stock. A sale would have given rise to a capital gain, so additional stock would have had to be sold to provide for the payment of the income tax. As a result, the executors

determined they would be required to sell 66,692 shares of class B stock, leaving only 42,758 shares of class B stock worth $2,351,690 to offset the remaining estate taxes of $2,349,244, plus interest and estate income taxes.

The executors determined that a sale of such a large block of class B stock could jeopardize the estate's subsequent ability to meet its obligations. At the time they made their decision, the executors determined that it was preferable to preserve all of decedent's stock and to borrow funds at favorable interest rates, in order to better ensure the estate's ability to pay its obligations. The executors knew that the estate would have incurred substantial interest expenses if it had made a section 6166 election or if it had obtained loans to pay the estate's obligations.

In a line of cases going back to 1937, this Court and its predecessor have recognized that the payment of interest on estate tax or on money borrowed to pay estate tax is deductible. See Estate of Bahr v. Commissioner, 68 T.C. 74 (1977); Estate of Todd v. Commissioner, 57 T.C. 288 (1971); Estate of Huntington v. Commissioner, 36 B.T.A. 698 (1937); see also Estate of Graegin v. Commissioner, T.C. Memo. 1988-477; Estate of Sturgis v. Commissioner, T.C. Memo. 1987-415.

In Estate of Bahr v. Commissioner, supra, a Court-reviewed opinion, the estate incurred liability for interest incurred on

deferred estate tax, which the estate deducted as an administration expense on the estate tax return. The Commissioner disallowed the deduction on the ground that interest on a tax was the same as the tax itself, which was not deductible as an administration expense. The Court held that the interest expenses claimed by the estate were deductible as an administration expenses. The Court stated: "It is well settled that an estate may borrow money from a private lender to satisfy its Federal estate tax liability and deduct the interest incurred on the debt as an administration expense under section 2053(a)(2)." Id. at 82.

Decedent's estate relies on Estate of Huntington v. Commissioner, supra, which involved the deductibility of discounts, expenses, and premiums related to the issuance and retirement of notes issued by a decedent's estate. In Estate of Huntington, the estate was composed of assets that included closely held business interests and large parcels of real estate. A short time before the Federal estate tax return was due, the executors filed a petition with a California court for authority to issue unsecured 5-year 6-percent notes of the estate in the face amount of $9,500,000, and to sell these notes for a price of 96 percent of their face value and, further, to redeem them prior to maturity pursuant to a schedule of premiums set forth in the petition. We noted that "The issuance of the notes avoided the

necessity of sacrificing the assets of the estate by immediate or forced sale of the same, or any part thereof, and the expenditures properly incident thereto were clearly made for the purposes of preserving and preventing waste of the estate". Id. at 726. Additionally, the estate faced valuation disputes with the Commissioner. These claims and disputes showed that the estate could not have been closed and the loans were warranted. We held that the discount and redemption premiums that were authorized by a California court constituted proper administration expenses of the estate.

Respondent distinguishes Estate of Huntington, on the ground that the loans in that case were authorized by a local probate court. However, section 20.2053-1(b)(2), Estate Tax Regs. provides that "a deduction * * * of a reasonable expense of administration, will not be denied because no court decree has been entered if the amount would be allowable under local law." In this regard, we note that the executor in Cleveland Bank and Trust Co v. Olsen, 682 S.W.2d 200 (Tenn. 1984), did not seek prior court approval for the loans it obtained. Nonetheless, the Tennessee Supreme Court held that the interest charged was a proper administration expense where the testator had incorporated the provision of Tenn. Code Ann. sec. 35-50-110 in his will.

Respondent attempts to bring this case within the scope of Hibernia Bank v. United States, 581 F.2d 741 (9th Cir. 1978). In

Hibernia Bank, within 18 months after the decedent's death, virtually all specific bequests and all Federal and State death taxes had been paid. The decedent's estate was composed mainly of a large mansion and shares of Hibernia Bank stock. Hibernia Bank served as the executor of the estate. Rather than distribute the remaining assets, Hibernia Bank attempted to sell the mansion as an accommodation to the beneficiaries of the estate, who preferred to receive distributions of cash instead of undivided interests in the property. The estate was held open for an additional 7 years until the mansion eventually was sold. There were, apparently, no affairs to be wound up or reasons for the estate to remain open, other than the sale of the mansion. In the interim, the executor bank spent approximately $60,000 each year to maintain the mansion and borrowed a total of $775,000 (approximately 80 percent of which was lent by Hibernia Bank), rather than selling the publicly traded Hibernia stock to raise the funds for this purpose.

In Hibernia Bank, the court ruled that the interest on these loans did not represent expenses actually and necessarily incurred in the administration of the estate. The personal representative could have distributed undivided interests in the mansion to the residuary beneficiaries of the estate, rather then keeping the estate open until the mansion was sold. The court determined that the estate administration had been prolonged,

not by liquidity problems or valuation disputes, but by the sale of the mansion, and thus had been unduly prolonged. See sec. 20.2053-3(d)(1), Estate Tax Regs. (expenses of caring for and preserving property will not be allowed "for a longer period than the executor is reasonably required to retain the property").

The facts in this case are distinguishable from those of Hibernia Bank. In this case, the most valuable estate assets were the shares of class B and class E stock in the Company. The Company was neither able nor required to redeem enough of these shares to provide funds to pay all death taxes and all the estate's other actual or potential liabilities when due. Further, the executors believed that the Company stock was likely to increase in value. Accordingly, borrowing funds, rather than selling stock, allowed decedent's estate to more easily meet its burdens by taking advantage of the increasing value of the stock. The Company's shares of stock were less marketable than in Hibernia Bank as they were not publicly traded. While it is true that the executors of decedent's estate were also directors of the Company, this fact alone will not make the loans unauthorized as the executors have been shown to have acted in the best interest of decedent's estate.

Decedent's estate further relies on Estate of Todd v. Commissioner, 57 T.C. 288 (1971). In Estate of Todd, the estate borrowed $300,000 from a private source. The estate consisted

largely of illiquid assets. If the loans had not been obtained, the estate would have been required to sell its assets on unfavorable terms to raise funds for the payment of death taxes. In Estate of Todd, we held that the estate could deduct interest on the loans and noted that Texas law specifically authorized an executor to borrow funds on behalf of an estate.

Decedent's estate also relies on Rev. Rul. 84-75, 1984-1 C.B. 193, to support its position that the interest expenses incurred on the loans were actually and necessarily incurred administration expenses that are deductible under section 2053. In this ruling, the estate consisted almost entirely of closely held stock, but the executor did not make the election to defer taxes under section 6166. Instead, the estate borrowed funds from a private source to pay the Federal estate tax obligations. The ruling states that interest on the private loan was deductible because the loan was obtained to avoid a forced sale of assets. This ruling, although it lacks the force of precedent, recognizes that there are circumstances in which an executor may reasonably choose to obtain a private loan on behalf of an estate, even though the estate could qualify for section 6166 deferral.

In Estate of Sturgis v. Commissioner, T.C. Memo. 1987-415, the personal representatives of an estate obtained a $2,669,616 loan from private sources to pay State and Federal death and

estate taxes and interest. Approximately 3 years later, the personal representatives had paid only $11,000 towards the principal on the loan; however, the estate held assets with a market value of $944,448. The Commissioner disallowed almost all of the interest expenses claimed on the loan on the ground that the loan was not necessary for the administration of the estate. We rejected the Commissioner's argument and held that the interest expenses were deductible. We stated that

> Although respondent has suggested the executors could have sold more land or timber, and that no contingency reserve is appropriate, we are not prepared to second guess the judgments of a fiduciary not shown to have acted other than in the best interests of the estate. * * * the fiduciaries to have been prudent indeed to have anticipated contingencies such as an increased estate tax liability. [Id.]

Moreover, in Estate of Sturgis, we determined that the value of the estate's real property was understated by approximately $2 million and noted that the personal representatives turned out to be very prudent in retaining a contingency reserve.

In this case, respondent initially sought to impose approximately $2 million in additional gift and estate taxes on decedent's estate, plus interest, virtually all of which related to respondent's attempt to increase the value of the Company stock. Respondent has conceded this issue. We do not think that the loans in this case were unnecessary, either when made or because the estate administration has been unduly prolonged,

especially in view of respondent's proposed assertion of increased deficiencies.

Decedent incorporated the provisions of Tenn. Code Ann. sec. 35-50-110 in her will, thus giving her executors a wide range of powers, including the power to obtain loans on behalf of the estate and to pledge assets to secure those loans. There is nothing in the will to suggest decedent intended to restrict this specifically granted authority. A testator's intent "must be ascertained from that which he has written into the will, and not from what some interested party supposes that he intended to do." Davis v. Price, 226 S.W.2d 290, 292 (Tenn. 1949). The estate's interest expenses are deductible as administration expenses under section 2053(a)(2).

## II. Respondent's Alternative Theory.

Respondent alternatively argues that decedent's estate is not entitled to a deduction under section 2053(a)(2) for interest expense accruing on loans during the period in which a promissory note from the Company, on which the estate was payee, produced interest income exactly offsetting the Provident Loan interest expense. Decedent's estate sold a substantial block of class B stock to the Company on December 30, 1991. In exchange, decedent's estate received a cash payment and a promissory note, the terms of which were identical to the terms of the promissory note which the estate had previously executed in favor of

Provident.  The Company repaid its note to decedent's estate on January 15, 1993, at which time the estate also repaid the Provident Loan.  Respondent asserts that the elimination of a claimed expense should also eliminate its deductibility, citing Estate of Street v. Commissioner, 974 F.2d 723 (6th Cir. 1992), affg. in part and revg. in part T.C. Memo. 1988-553.  We disagree.

Respondent contends that the interest incurred on the Provident Loan during the post mortem period in which the Company paid the exact amount of interest on its notes to decedent's estate had no negative impact on the net estate.  Respondent quotes the following passage from Estate of Street to support her position:  "'To pay the interest on the deferred taxes out of income of the estate would neither increase nor decrease the principal of the estate as it was at the time of decedent's death.'"  Id. at 727-728 (quoting Estate of Richardson v. Commissioner, 89 T.C. 1193, 1205 (1987)).  The issue in Estate of Street was whether the marital deduction has to be reduced by interest on deferred taxes and other administration expenses that were paid out of the income generated by the marital share of the estate.  Explaining the meaning of the Estate of Richardson decision, the Court of Appeals in Estate of Street stated: "Therefore, Estate of Richardson stands only for the proposition that the payment, from income, of interest on inheritance and

estate taxes will not reduce the marital deduction." Estate of Street v. Commissioner, supra at 728. The court in Estate of Street further noted that its holding was mandated by, and consistent with, section 2056(b)(4) and section 20.2056(b)-4(a), Estate Tax Regs. We find that Estate of Street dealt solely with the calculation of the marital deduction and is not relevant to the current matter.

Respondent further relies on Estate of Sachs v. Commissioner, 856 F.2d 1158, 1160 (8th Cir. 1988), revg. 88 T.C. 769 (1987), as additional support for her argument that the deduction for interest accruing from December 31, 1991, to January 15, 1993, should be disallowed. The issue in Estate of Sachs was whether an estate was entitled to a deduction for certain income taxes paid as a result of a net gift made by the decedent prior to his death. The U.S. Court of Appeals for the Eighth Circuit had previously decided in another case that the payment of gift taxes by the recipient of a gift results in income to the donor. This holding was upheld by the U.S. Supreme Court and the Sachs estate paid the income taxes that were owed as a result of this decision and also claimed these taxes as an administration expense.

The Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, in certain circumstances granted relief from income tax for donors of net gifts made prior to a specified date. As a result

of this congressional action, the Sachs estate received a full refund of the taxes it had paid.  Under these facts, the Court of Appeals for the Eighth Circuit disallowed the claimed deduction for income tax paid, because the estate's obligation for such taxes had been eliminated, and the estate had been made whole by receiving a full refund of those taxes.

Unlike the income tax in Estate of Sachs, the interest expenses paid by the estate in this case have not been refunded, forgiven, or eliminated.  The interest expenses were allowable under Tennessee law and were paid out of the estate's assets.  We hold that the interest expenses constitute a deductible administration expense under section 2053(a)(2).

III.  Conclusion

Pursuant to section 2053(a) and section 20.2053-1(a)(1), Estate Tax Regs., an estate generally may deduct an administration expense that is allowable as a legitimate charge against the estate under the laws governing decedents' estates in the State of the probate proceeding.  In this case the estate in the course of its administration was obliged to incur interest expenses whether the executors made a section 6166 election or whether the executors decided to borrow funds from a third party to pay the estate's Federal and State tax obligations. Decedent's estate has met its burden of proving that the loans were necessary costs of administering the estate.  The Company

was not required to redeem enough of decedent's shares of class B stock to provide funds to pay all death taxes and all the estate's other actual or potential liabilities when due. It is not our province, and we are not prepared, to second guess the business judgments of the executors, for the executors have not been shown to have acted other than in the best interests of the estate. We believe that the executors' decision not to make a section 6166 election was prudent because, among other reasons, the estate benefited from increases in value to the Company stock and, consequently, decedent's estate was in a better situation to face contingencies such as an increased estate or gift tax liability. These loans allowed the estate to pay its Federal estate obligation in full shortly after decedent's death. Decedent's estate is entitled to a deduction for the interest expenses incurred on these loans under section 2053(a)(2). We have considered all other arguments made by petitioners and respondent and find them to be either irrelevant or without merit.

Based on the foregoing,

Decision will be entered under

Rule 155.