# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 25, 2012

Lyle W. Cayce
Clerk

No. 10-41311

THOMAS LANE KELLER, Co-Independent Executor of the Estate of Maude Williams, Deceased; ANN HARITHAS, Co-Independent Executor of the Estate of Maude Williams, Deceased; STEVEN CRAIG ANDERSON, Co-Independent Executor of the Estate of Maude Williams, Deceased,

Plaintiffs-Appellees

v.

UNITED STATES OF AMERICA,

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and PRADO and SOUTHWICK, Circuit Judges.
EDITH H. JONES, Chief Judge:

Maude Williams passed away in May 2000, leaving behind both a substantial fortune and incomplete estate-planning documents. Originally believing this omission precluded transfer of the relevant estate property to a limited partnership, her Estate paid over $147 million in federal taxes. The Estate later discovered Texas state authorities supporting that Williams sufficiently capitalized the limited partnership before her death, entitling the Estate to a substantial refund. In this refund suit, the Estate claimed a further substantial deduction for interest on the initial payment, which it retroactively

No. 10-41311

characterized as a loan from the limited partnership to the Estate for payment of estate taxes. The district court upheld both of the Estate's contentions. We AFFIRM.

## BACKGROUND

The following findings emerge from a four-day bench trial. Maude Williams was married to Roger Williams. The couple lived in Victoria, Texas, and had two children and six grandchildren. Following their daughter's divorce, the Williamses set about extensive estate planning to preserve family assets.

The Williamses first settled the RPW/MOW Family Trust (the "Family Trust") in 1998 — a revocable trust into which the couple placed approximately $300 million of cash, certificates of deposit, and bonds. The trust agreement provided that on either spouse's death, the Family Trust would terminate, split into two shares (Share A and Share M), and fund two respective trusts (Trust A and Trust M). The agreement further provided that on the surviving spouse's death, Trust A and Trust M would terminate to fund six family trusts for the Williamses' grandchildren.

After Roger's death in 1999, Maude became the trustee of both the shares and the trusts and began exploring further options for protecting her family's assets, including establishing a family limited partnership ("FLP"). She consulted with the family's longtime CPA, Rayford Keller, and his son, Lane Keller, and ultimately decided to establish a FLP. The FLP was to consist of two limited partners — Trust A and Trust M, settled from the Family Trust — and a general partner, a limited liability company formed alongside the partnership. The limited partner trusts were each to hold 49.95 percent limited partnership interests, while the new general partner LLC was to hold a 0.1 percent general partnership interest. Maude would initially own all shares of the LLC.

Trusts A and M were to fund the FLP. The Kellers organized a spreadsheet in September 1999 listing specific assets to be transferred to the

2

No. 10-41311

FLP. Maude reviewed this spreadsheet in 1999, but neither signed it nor memorialized her agreement with the Kellers' plans in writing. Based on her implicit approval, Lane formalized these plans in January 2000 in a flowchart and a series of notes indicating how various trust accounts would fund the FLP principally with "Community Property" bonds and cash amounting to $250 million.

Maude was diagnosed with cancer that March and hospitalized several times in May. Her FLP advisers reduced Maude's FLP estate plans to a partnership agreement and LLC incorporation documents, which Lane took to Maude in her hospital room. In a meeting lasting two hours, Lane carefully went over with Maude the details of these documents. The court found that she was able to understand their legal ramifications. She signed the constitutive agreements multiple times, as required, and Lane notarized her signatures.

Article VIII of the partnership agreement, entitled "Capital Contributions," provided that "[e]ach partner shall contribute to the Partnership, as his initial Capital Contribution, the property described in Schedule A as part of the Agreement." Lane left Schedule A blank; he testified at trial that he left the schedule blank because he did not have the firm market value of the bonds on hand. While the Kellers' extensive notes and spreadsheet indicated Maude's expected capital contribution to the FLP, the specific contributions meant for the blanks on Schedule A could not be discerned from anything else in the partnership agreement.

Several extrinsic sources, however, corroborate that Maude intended her initial capital contribution. Rayford made handwritten notes on May 10 stating: "Mrs. W. put in $300M, $250M of which will be invested in MOW/RPW, LTD," the official name of the FLP. The notes also said to "[t]ransfer $250MM from RPW/MOW FT (Community) to Ltd." Lane also drafted a check from one of the Family Trust accounts for Maude's initial capitalization of the LLC that day,

3

No. 10-41311

which Maude never signed. Maude's advisers filed the Articles of Organization of the LLC and registered the limited partnership with the Texas Secretary of State on May 11. The Secretary of State issued both a Certificate of Organization and a Certificate of Limited Partnership. Lane intended to complete the outstanding requirements to finalize and fund the LLC and FLP within a week.

Maude passed away on May 15. Her advisers initially believed they failed to fully create and fund the FLP before Maude's death and ceased attempts to activate the FLP and LLC. The Estate paid over $147 million in estate taxes in February 2001. Lane reconsidered this position in May 2001 after he attended a continuing legal education seminar; he resumed activity with the FLP, including formally transferring the Community Property bonds to the FLP. The Kellers realized that having successfully established the FLP meant the Estate had lacked liquid assets to issue a $147 million tax payment. Consequently, the Estate's advisers retroactively restructured this transaction as a $114 million loan from the FLP, effective February 2001. The Estate issued a promissory note to the FLP at the applicable federal interest rate effective February 2001.

The Estate filed a claim for a refund with the IRS in November 2001 on two grounds: (1) the Estate's initial fair-market value assessment of Maude's assets failed to discount appropriately the value of the partnership interests, thereby leading to an initial overpayment; and (2) the Estate accrued interest on its loan from the FLP to pay estate taxes, entitling the Estate to a deduction. After six months passed without IRS action, the Estate filed a complaint in the district court on the same grounds.

The district court heard the case in a four-day bench trial. The Estate argued that under Texas law, Maude's intent to transfer bonds into the partnership transformed those bonds into partnership property, notwithstanding her failure to complete the partnership documents. This transfer, the Estate

No. 10-41311

argued, necessarily rendered the tax payment a loan from the FLP, entitling the Estate to an interest deduction as an actual and necessary expense of administrating the estate. The Government raised several objections to the Estate's arguments, including that Maude failed to create the FLP at all; that Texas law required Maude to have committed her transfer of assets to the partnership in writing; and that any purported loan between the Estate and partnership was a sham transaction.

The court's findings of fact include that Maude intended the Community Property bonds to be partnership property on the execution of the partnership formation documents. Further, Maude's intent bound all of the relevant entities — the LLC as the general partner and Trusts A and M as limited partners. The court also found that the FLP was created for a limited, non-tax-related purpose, and that Trusts A and M received full and adequate consideration in the partnership interests they received in exchange for contributing Community Property bonds.

The district court rejected the Government's arguments. Reviewing Texas law, the court held that Maude's intent to transfer the bonds to the FLP was sufficient to transfer the bonds regardless of record title or the absence of a writing confirming that transfer. Moreover, because the bonds sold to satisfy estate taxes were in fact FLP property, the transfer from the FLP to the Estate was "actually and necessarily incurred" in the administration of the estate, entitling the Estate to a corresponding deduction for the interest on the loan. The district court therefore granted the Estate a refund of $115,375,591.

## STANDARD OF REVIEW

The Government appeals, re-urging legal issues but not challenging the court's factfinding. We review the district court's legal conclusions de novo. *Bemont Invs. L.L.C. v. United States*, 679 F.3d 339, 343 (5th Cir. 2012).

No. 10-41311

## DISCUSSION

The Internal Revenue Code imposes an estate tax on a decedent's "taxable estate" — the value of the gross estate less applicable deductions.  I.R.C. § 2051. The gross estate's value "shall be determined by including . . . *the value at the time of his [the decedent's] death* all property" of any kind.  I.R.C. § 2031(a) (emphasis added).  We first resolve the Government's challenge to the discounted valuation of Maude's estate before turning to the Estate's claimed interest deduction.

## I.    Valuation of the Estate

A decedent's partnership interest is not usually valued at the pro rata share of the property owned by the partnership.  An estate is entitled to a discount on the value of that interest to reflect restrictions on the interest's transferability and other burdens on the partnership interest.  *See generally Strangi v. Comm'r,* 417 F.3d 468, 474, 475 & n.2 (5th Cir. 2005).  As the parties' dispute reveals, a substantial valuation discount hinges on whether the Community Property bonds were transferred effectively to the FLP.  This inquiry involves various questions controlled by Texas state partnership law. *Adams v. United States*, 218 F.3d 383, 386 (5th Cir. 2000) ("To determine the exact nature of the property or interest in property . . . federal courts must look to state law, in this case Texas partnership law.").

Drawing on cases addressing property transfers in general partnerships, the district court concluded — and the Estate urges now — that "[w]ell-established principles of Texas law provide that the intent of an owner to make an asset partnership property will cause the asset to be the property of the partnership." This is clearly true for acquisitions of property by already existing partnerships and for settling title to property where legal title rests with the partnership but the property is actually used by a partner in his personal capacity, or vice-versa.

6

No. 10-41311

Texas case law supports this interpretation. The Texas Supreme Court expressly relied on a purchasing partner's intent as controlling whether newly acquired property belonged to a partner or the partnership. *See Logan v. Logan*, 156 S.W.2d 507, 511-12 (Tex. 1941). There, a decedent's partner claimed a partnership interest in a parcel of land financed by a personal loan to the decedent and a personal promissory note. *Id.* The decedent's estate argued that either the decedent's purchase of the property with individual credit or the decedent's receipt of title in his individual name controlled the land's ownership. *Id.* at 512. The Texas Supreme Court pointedly rejected each of these positions, because "[w]hether or not land taken in the name of one or more partners is in fact partnership property *always depends upon the intent of the parties* and the understanding and design under which they acted." *Id.* (emphasis added). This principle held whether intent was determined through express or implied agreement. *Id.* And the Texas courts of appeals have consistently relied on and cited *Logan* for this purpose. *See, e.g.*, *Siller v. LPP Mortg., Ltd.*, 264 S.W.3d 324, 329 (Tex. App.—San Antonio 2008, no pet.) (noting ownership of property used by partnership was "a question of intention" and examining sufficiency of intent evidence); *Foust v. Old Am. Cnty. Mut. Fire Ins. Co.*, 977 S.W.2d 783, 786 (Tex. App.—Fort Worth 1998, no pet.) ("However, under well-established partnership principles, ownership of property intended to be a partnership asset is not determined by legal title, but rather by the intention of the parties as supported by the evidence."); *Biggs v. First Nat. Bank of Lubbock*, 808 S.W.2d 232, 237 (Tex. App.—El Paso 1991, writ denied) ("While mere use of property by the partnership does not make it an asset of the partnership, the question of actual ownership is one of intention. Under well-established partnership principles, ownership of property intended to be a partnership asset is not determined by legal title. The intention of the parties, as found by the jury and supported by the evidence, is controlling.") (citation omitted); *Conrad v. Judson*,

7

465 S.W.2d 819, 828-29 (Tex. Civ. App.—Dallas 1971, writ ref'd n.r.e.) (discussing presumption of intent and requirement of demonstrating proof of intent as controlling partnership title to challenged property).

This case admittedly reaches us in a somewhat different posture: rather than addressing property acquired or used by an already-formed partnership, the question here is whether title to property passed to the FLP contemporaneous with its formation.  Further, as the Government points out, the FLP is a limited partnership, formed under the then-applicable Texas Revised Limited Partnership Act ("TRLPA") rather than general partnership laws.  TEX. REV. CIV. STAT. ANN. art. 6132a-1 (Vernon 2000) [hereinafter TRLPA].  Under the TRLPA,  "[i]n any case not provided for by this Act, the applicable statute governing partnerships that are not limited partnerships and the rules of law and equity . . . govern."  TRLPA § 13.03(a).  Texas courts have not directly addressed whether the *Logan* rule applies at partnership formation as it does during partnership operation and dissolution.  However, they continually emphasize the controlling nature of partnership intent in comprehensive terms.  To the extent this remains an unresolved question under Texas law, our "*Erie* guess" is that Texas courts would apply *Logan*, absent a contravening provision of the TRLPA, and would use intent in determining property ownership in an initial partnership capitalization.  *See Wiltz v. Bayer CropScience, Ltd. P'ship*, 645 F.3d 690, 695 (5th Cir. 2011).

In lieu of challenging the district court's factual finding that Maude intended to transfer the bonds in question to the FLP, the Government invokes provisions of the TRLPA that assertedly prohibit concluding that a transfer occurred.  The Government first turns to TRLPA § 5.02(a), a statute of frauds provision, which requires any "promise by a limited partner to make a contribution to, or otherwise pay cash or transfer property to, a limited partnership is not enforceable unless set out in writing and signed by the limited

partner." But the Government's reliance on Section 5.02(a) ignores that under Texas law, Maude transferred the Community Property bonds to the FLP immediately by forming the partnership and executing the partnership agreement with the intent that the Community Property bonds were partnership property. This intent on forming the partnership and transferring the bonds immediately conferred "equitable title . . . [to] the partnership." *Biggs*, 808 S.W.2d at 237. Section 5.02(a) is inapplicable.

The Government also asserts that TRLPA § 1.07(a)(4)(A) required Schedule A to be filled out before Maude's death to transfer the bonds to the FLP. Section 1.07(a)(4)(A) provides in relevant part that

> [a] domestic limited partnership shall keep and maintain the following records . . . unless contained in the written partnership agreement, a written statement of . . . the amount of the cash contribution and a description and statement of the agreed value of any other contribution that the partner has agreed to make . . . .

The Government then invokes an unpublished Texas court of appeals case, *Bird v. Lubricants, USA, LP*, No. 2-06-061-CV, 2007 WL 2460352, at *3 (Tex. App.—Fort Worth Aug. 31, 2007, pet. denied) (mem. op.), which stated, addressing the allocation of partnership interest assignments, that a written partnership agreement governs the partners' relationships subject to the provisions of the TRLPA. The quotation on which the Government relies simply restates a familiar nostrum of contract law, not an abrogation of a repeatedly followed principle in Texas partnership law.

Further, the Government's construction of Section 1.07(a)(4)(A) as potentially invalidating transfers, rather than a mere record-keeping provision, ignores a subsequent clause in Section 1.07(a)(4)(A), which requires a limited partnership to maintain records of "the amount of the cash contribution and . . . the agreed value of any other contribution that the partner has agreed to make in the future as an additional contribution." *Id.* If Section 1.07(a)(4)(A)

invalidated Maude's transfer for failure of recordation, then *any* limited partner's future promise to make a contribution — as required by Section 5.02(a), on which the Government also relies — would be covered by Section 1.07(a)(4)(A), which requires a record of "any other contribution" made by "each partner."    The Government's construction of Section 1.07(a)(4)(A) renders Section 5.02(a) superfluous — an outcome we avoid as a "cardinal principle of statutory construction." *In re Pierrotti*, 645 F.3d 277, 280 (5th Cir. 2011).  We avoid this result by rejecting the Government's position that Section 1.07(a)(4)(A) invalidates noncompliant property transfers; more sensibly construed, it is a mandatory record-keeping provision, the breach of which may give rise to suit for violating duties between partners.

As the Estate points out, at least one federal district court has applied Texas law to  resolve a formation-stage problem in a family limited partnership in a similar way.  In *Church v. United States*, 85 A.F.T.R.2d 2000-804 (W.D. Tex. 2000), *aff'd*, 268 F.3d 1063 (5th Cir. 2001), a decedent and her children executed documents to form a family limited partnership for estate-planning purposes and transferred both a ranch and valuable securities to the partnership.  The family fully executed the documents fully before the decedent's death, but failed to form the partnership's planned corporate general partner, to file the certificate of limited partnership with the Texas Secretary of State, and to transfer legal title of the securities to the partnership prior to the decedent's death.  The *Church* court nonetheless sustained the requested estate valuation discounts because, despite several defects in forming the family limited partnership, the *Church* family limited partnership "was in substantial compliance in good faith with the [TRLPA]," and the actual possession of legal title to the securities was of no moment, because the decedent's intention to transfer the property to the partnership was sufficient.

No. 10-41311

The Government attempts to distinguish *Church* by maintaining that the *Church* family recorded their asset transfer in a written partnership agreement rather than merely intending it along with executing a valid partnership agreement. Yet it apparently concedes the legitimacy of the *Church* transfer and, indeed, the *Church* limited partnership. The TRLPA states that

> [t]o form a limited partnership, the partners *must* enter into a partnership agreement . . . and one or more partners, including all of the general partners, *must* execute a certificate of limited partnership. The filing fee and the certificate *shall* be filed with the secretary of state . . . .

TRLPA § 2.01(a) (emphasis added). If, as the Government contends, the violation of Section 1.07(a)(4)(A), a mandatory provision of the TRLPA, invalidates an underlying transfer of assets, it is difficult to see why the Government concedes that an equally mandatory provision governing the entity's formation has no such effect. While we need not — and do not — decide the effect of a failure to register under Section 2.01(a) prior to a decedent's death,[1] this inconsistency highlights the weakness of the Government's interpretation of Section 1.07(a)(4)(A).

Finally, the Government contends that the FLP ceased to exist on Maude's death, because this triggered immediate termination of Trusts A & M and the assignment of their limited partnership interests. The TRLPA defines a limited partnership as "a partnership formed by two or more persons . . . and having . . . one or more limited partners," the Government argues, and provides that "[a] certificate of limited partnership shall be canceled . . . when there are no limited partners." TRLPA §§ 1.02(6), 2.03(a)(2). Therefore, the Government asserts, when a limited partnership ceases to have limited partners, it must surrender

---

[1] Texas courts have in fact held under TRLPA that failure to file a certificate of limited partnership did not necessarily preclude recognition of the limited partnership. *See Shindler v. Marr & Assoc.*, 695 S.W. 2d 699, 702-04 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

No. 10-41311

its certificate of limited partnership for cancellation and correspondingly dissolve.

While superficially plausible, this interpretation runs afoul of the TRLPA. Most straightforwardly, Section 8.01 of the TRLPA provides that "[a] limited partnership is dissolved and its affairs shall be wound up *only* on the first of" (1) a partnership-agreement-required dissolution, (2) consent of all partners, (3) an event of withdrawal of a general partner (with certain exceptions), or (4) a judicial decree requiring dissolution. TRLPA §§ 8.01(1)-(4) (emphasis added). None of the four listed exclusive scenarios involves the departure of one, several, or even all of the partnership's limited partners. In contrast, Section 8.01(3) provides specific alternative circumstances where the withdrawal of a *general* partner must or may not wind up the partnership. And under Section 7.02(a)(2), the assignment of a limited partnership interest does not dissolve the partnership.

The Government's reply brief rifles through other provisions of TRLPA, the various trust documents, and Texas trust law in support of its contention that Maude's death caused the cessation of the limited partnership. None of these authorities were cited in the Government's opening brief. We do not consider such intricate and detailed arguments when raised for the first time in a reply brief. *Cox v. DeSoto Cnty., Miss.*, 564 F.3d 745, 749 (5th Cir. 2009).

None of the Government's challenges to Texas's overarching rule that intent determines property ownership is availing. Maude therefore transferred to the FLP the full amount of the applicable Community Property bonds before her death, and the district court correctly applied the relevant discount reflecting the encumbrance on the partnership interests.

## II. Deductibility of the Retroactively Structured Loan

An estate may deduct those expenses "actually and necessarily[] incurred in administration of the decedent's estate" from the estate's value for tax

12

purposes. Treas. Reg. § 20.2053-3(a). This includes interest on loans taken to pay debts of an estate, such as estate taxes, if those loans are necessary to pay estate debts. *Estate of Black v. Comm'r*, 133 T.C. 340, 380 (2009). The district court concluded that, following Maude's transfer shortly before her death, the Estate lacked the liquid assets necessary to pay estate taxes as then-estimated, and allowed the resultant loan interest deduction. The Government challenges this deduction on two grounds: by reiterating its challenge to the initial transfer of the Community Property bonds to the FLP, and by asserting that the loan could have as easily been retroactively characterized as a distribution, rendering it not "actually and necessarily incurred" in the meaning of the governing regulation. We reject the first argument for the reasons discussed above.

The Government's second argument, however, is more difficult. The Tax Court has permitted deductions on loans between an estate and a closely related business entity several times, typically because any obvious revenue-raising alternative to the loan threatened to diminish asset value. For example, in *Estate of Graegin v. Comm'r*, 56 T.C.M. (CCH) 387 (1988), the Tax Court upheld an interest deduction by an estate because the vast majority of the estate's value was locked in shares of stock in a family corporation. The estate in turn borrowed over $200,000 from the corporation — over which it held majority control — to pay estate taxes, and claimed the interest on the loan as a tax deduction. *Id.* The Tax Court allowed the deduction because the estate, while solvent, lacked liquidity: "[e]xpenses incurred to prevent financial loss to an estate resulting from forced sales of its assets in order to pay estate taxes are deductible." *Id.* The Tax Court, "mindful of the potential for abuse" presented by recognizing such a loan as necessary (and therefore deductible), approved the deduction. *Id.* But the apparent key feature from *Graegin* and related cases is that the estate took out the loan in lieu of liquidating a highly illiquid asset at a loss, *Graegin*, 56 T.C.M. (CCH) 387; *Estate of Bahr v. Comm'r*, 68 T.C. 74

No. 10-41311

(1977) (approving interest deduction of loan taken in lieu of selling "essentially non-income-producing land" at "substantial financial loss" after estate promptly sold all liquid assets); *Estate of Todd v. Comm'r*, 57 T.C. 288 (1971) (approving interest deduction of loan taken to avoid "estate liquidation [of] some of its nonliquid assets . . . at reduced prices"); s*ee also McKee v. Comm'r*, 72 T.C.M. (CCH) 324 (1996) (approving loan in lieu of sale of stock in light of loan's origination allowed company to "tak[e] advantage of the increasing value of the stock").

The Government offers, in contrast, *Estate of Black*, 133 T.C. 340 (2009), where the Tax Court denied a deduction for accrued interest on a loan between a family limited partnership and a decedent's estate. In *Estate of Black*, an insurance executive established several trusts for his grandchildren and gifted to them substantial amounts of stock. *Id*. at 348. He then founded a family limited partnership (Black LP) and conveyed to it his personal stock shares — by far his most significant asset, and substantially all of his estate's remaining value — as well as the trusts' shares in exchange for partnership interests. *Id*. After his passing, the estate borrowed $71 million from Black LP and sought a deduction for the interest paid on the loan.[2] *Id*. at 382-83. The estate argued its only meaningful remaining asset was the Black LP interest and that the $71 million loan solved a "liquidity dilemma" and was therefore deductible. The Tax Court disagreed, first observing that the Black LP interest was, for purposes of the $71 million  loan, the only meaningful asset of the Black estate; the stock shares in turn were the only meaningful asset of Black LP. *Id*. at 383-84. It was therefore impossible to repay the loan between the Black estate and Black LP "without resort to Black LP's . . . stock attributable to the borrowers' . . . limited partnership interests in Black LP." In other words, the Black estate would

---

[2] Black predeceased his wife; *Estate of Black* probated that estate. *Id*. at 343. This distinction is irrelevant for our purposes.

14

No. 10-41311

eventually be required to sell Black LP's stock or its partnership interest to satisfy the loan, and its financing structure merely constituted an "indirect use" of that stock to generate a tax deduction. *Id.* at 384. The Tax Court concluded this "indirect use" of Black LP's stock distinguished the case from *Estate of Todd*, *Graegin*, and *McKee*, "in which loans from a related, family-owned corporation to the estate were found to be necessary" to avoid forced sales of liquid assets or to retain an asset for future appreciation. *Id.* at 384-85.

While the *Estate of Black* court's indirect-use distinction perhaps separated that case from the general trend of *Todd*, *Graegin*, and *McKee*, we do not find that distinction applicable here. The key to the Tax Court's indirect-use observation in *Black* was the Black estate's essential insolvency vis-a-vis the $71 million loan *without* resort to the sale of stock or partnership units. The Black estate could not satisfy its tax burden without selling Black LP's stock or control of that stock through a partnership distribution, a sale of the underlying stock, or a redemption of the partnership interest. The common denominator among these options was the sale of the underlying stock held by Black LP. The Black estate, confronting this inevitable outcome, characterized the transfer as a "loan" to obtain favorable tax treatment. The Estate here faces no such inevitable outcome because it need not resort to redeeming partnership units or distributing the FLP's assets to eventually repay the loan. The Estate's assets excluding the FLP interests includes over $110 million in ranch and mineral holdings — classically illiquid assets in the meaning of *Graegin* — from which the Estate could repay the loan. As the record shows, Maude's estate planners ardently sought to *increase* her contribution to the FLP, but she refused, deliberately leaving several substantial, illiquid, and potentially income-generating assets in the Estate. Moreover, the Estate stands to gain a tax refund worth tens of millions of dollars from this litigation, which is a substantial fraction of the value of the loan. The Estate's repayment of the loan

is not predicated on the inevitable redemption of the FLP interests or its assets so as to constitute a forbidden "indirect use" in the meaning of *Black*.

Disregarding the Estate's remaining illiquid assets, the Government instead re-urges that the loan between the FLP and the Estate could have been characterized another way, *e.g.*, as a distribution, rendering the loan (and its interest) "unnecessary." This position, as just noted, takes *Black* too far. The Government also contends that the Estate's and FLP's common control between related entities renders any potential economic distinctions between the Estate and FLP as well as the chosen financing structure little more than a legal pretense or an indirect use. What this ignores is that after the effective transfer of the Community Property bonds to the FLP, they were no longer property of the Estate. The Estate, having realized it improperly disposed of bonds belonging to another legal entity (the FLP was actually controlled by other family members), was forced to rectify its mistake using the assets it had available — largely illiquid land and mineral holdings. In lieu of liquidating these holdings, it borrowed from the FLP. As did *Graegin*, we refuse to collapse the Estate and FLP to functionally the same entity simply because they share substantial (though not complete) common control. The district court correctly permitted a deduction for the interest on the resulting loan.

## CONCLUSION

The district court correctly concluded that Maude's intent on forming the FLP was sufficient under Texas law to transfer ownership of the Community Property bonds to the FLP. The district court also correctly concluded that the post hoc restructuring of the transfer as a loan from the FLP back to the Estate for tax purposes was a necessarily incurred administrative expense; the Estate retained substantial illiquid land and mineral assets that justified the loan, and the loan did not constitute an "indirect use" of the Community Property bonds. We therefore AFFIRM the district court's judgment.

**AFFIRMED.**